**UNITED STATES of America**

v.

**James CASTLE.**

**Cr. No. 651–62.**

United States District Court
District of Columbia.

Dec. 20, 1962.

Arthur J. McLaughlin, Asst. U. S. Atty., Washington, D. C., for plaintiff.

Worth Rowley, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

The defendant has moved to suppress certain evidence seized on May 18, 1962, from premises then occupied by him, under a search warrant issued on May 16, 1962, Commissioner's Docket 5, Case 208. Each of the contentions in support of this motion will be considered separately.

1. The defendant contends that the warrant was insufficient on its face, because it was issued on the basis of a joint affidavit signed by three police officials. The defendant argues that such a joint affidavit is illegal under Masiello v. United States, 304 F.2d 399 (D.C.Cir. 1962), which case was decided six days before the warrant in the instant case was issued. Masiello did not hold all joint affidavits illegal, but held that a joint affidavit must make clear which of the affiants was swearing to which part of the affidavit. 304 F.2d at 401–402.[1] In the instant case, the affidavit specifies with complete clarity which items of information were known by each of the affiants. The warrant is therefore not insufficient on this ground.

2. The defendant contends that the warrant was insufficient on its face, because the last sentence of the affidavit

---

[1] The court in Masiello concluded with an apt admonition: "Since needless difficulties may result from the use of joint affidavits in support of applications for warrants, the practice is undesirable." 304 F.2d at 402.

concludes with a statement that "the undersigned do believe that there is *not* illicit narcotic drugs being secreted inside of 1219 8th St. NW by James Castle and Andrew C. Dawkins." (Emphasis added.) Officer Paul testified that he had typed the affidavit; that the word "not" was a typographical error; and that the word was intended to be "now." (Tr. III, 4–10.) Officer Didone testified that when he signed the affidavit, he thought the word was "now." (Tr. IV, 3–5.) Matron Graves testified that the parts of the affidavit attributable to her were accurate. (Tr. III, 20–2.) These parts did not include the last paragraph. And the United States Commissioner testified that in reading the affidavit before issuing the search warrant, he thought the word was "now." (Tr. III, 10–14.[2])

The above oral testimony fortified the Court's conclusion that in the context of the entire affidavit, the word "not" was a mechanical mistake. The intended word—the only one that would make sense—was "now." The entire body of the affidavit follows:

"AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A U. S. COMMISSIONER'S SEARCH WARRANT for premises 1219 8th St. NW, entire premises occupied by James Castle and operated by James Castle and Andrew C. Dawkins, and arrest warrant for Andrew C. Dawkins

"Prior to May 15, 1962 Detectives Paul and Didone received information from two reliable sources of information who stated that James Castle alias Note and Andrew Charles Dawkins were selling heroin out of the premises 1219 8th St. NW.

"On May 15, 1962 Detective Paul received information from a third source of information who stated that it had been buying heroin from James Castle and Andrew Dawkins at 1219 8th St. NW, the last time being on May 14, 1962. The source

further advised that Castle had told it to use the rear door of the premises when it came to the house to obtain some drugs.

"On the morning of May 16, 1962 Detectives Paul and Didone received information from a fourth source of information, who has given reliable information in the past, who stated that it was buying heroin from James Castle and Andrew Dawkins at premises 1219 8th St. NW, and that it had seen others buy capsules of heroin from Castle and Dawkins while at the 8th St. address. The source further advised that Castle lived in the premises 1219 8th St. NW and that he either sold the heroin in the house, or stepped out into the rear yard of the premises to make the sale. The source also advised that Dawkins was selling for James Castle and that Dawkins would either sell the heroin inside of 1219 8th St. NW, or come out of the house and sell the heroin in the rear yard of the said address. Source further said that Castle had told it to come to the rear door of the premises when it wanted to purchase heroin. The fourth source further advised that it had just come from 1219 8th St. NW and that Castle and Dawkins had sold out, and that both of them had gone to obtain a fresh supply of heroin.

"About one hour after the fourth source had given Detectives Paul and Didone the above information it again contacted the officers and advised them that Castle and Dawkins had returned to 1219 8th St. NW and that they again had a supply of heroin on hand.

"On May 16, 1962 the fourth source of information was searched at the Womans Bureau by the Matron Mary Graves, who found the source to be free of any money or narcotic drugs. The source was then given a

2. The Commissioner actually read a carbon copy of the affidavit, after handing the original to the clerk. Tr. III, 13.

sum of MPDC advance funds by Det. Paul. Detectives Paul and Didone in company with Matron Graves and the source then drove to the vicinity of 7th and M St. NW. The source then left Detectives Paul and Didone, and under the observation of Matron Graves went to the rear door of 1219 8th St. NW, where Matron Graves observed the source contact a colored male who was wearing a green shirt. Matron Graves then observed the source leave the rear yard of 1219 8th St. NW and followed the source back to where Detectives Paul and Didone were waiting. Matron Graves had the source under observation from the time that it first left Det. Paul and Didone until it returned to where the officers were waiting. The source turned over to Det. Paul a quanitty [sic] of capsules of a white powder which it stated it had purchased from Andrew Dawkins with the MPDC advance funds. The source further advised that when it left Det. Paul and Didone it had walked directly to the rear door of 1219 8th St. NW where it contacted Andrew Dawkins. The source further advised that Dawkins, who was wearing a green shirt, stepped out of the house and that while in the rear yard of 1219 8th St. NW, Dawkins reached into his underwear and pulled out a quantity of capsules of a white powder which Dawkins handed to the source and that the source in turn handed Dawkins the MPDC advance funds. The source further advised that Dawkins then went back into 1219 8th St. NW, and that it could see James Castle standing inside of the rear door. The source was again searched by Matron Graves at the Womans Bureau and found to be free of any money or narcotic drugs.

"Detective Paul performed a preliminary field test on the white powder in one of the capsules which indicated by a positive color reaction the presence of a narcotic drug of the opiate group.

"James Castle is known to the Narcotic Squad as a convicted narcotic violator and admitted narcotic drug user, and Detectives Paul and Didone have personal knowledge that Castle has carried heroin on his person in the past. Andrew Dawkins is known to the narcotic squad as a narcotic drug user, and has admitted to the use of heroin.

"James Castle has previously given his address as 1219 8th St. NW, the last time being on May 8, 1962.

"The fourth source of information was shown MPDC identification photographs #98678 and #92518, and the source advised Detectives Paul and Didone that they were pictures of the said Andrew C. Dawkins and James Castle respectively.

"Because the sources of information have given Detectives Paul and Didone reliable information in the past and because of the events of May 16, 1962 along with the officers personal knowledge of James Castle and Andrew C. Dawkins, the undersigned do believe that there is not [sic] illicit narcotic drugs being secreted inside of 1219 8th St. NW by James Castle and Andrew C. Dawkins."

This affidavit was made a part of and attached to the standard form for an affidavit, which was also filled in, signed, and sworn to by the two detectives and Matron Graves. This standard affidavit used the word "now" in its printed portion (" * * * there is now being concealed certain property, namely * * * "). Thus the word "not" on the typed affidavit was a purely mechanical mistake in a pro forma, conclusory statement, and such mistake did not vitiate the substance of the affidavit.[3] The warrant was therefore sufficient on its face. Frankly,

---

3. The word "not" was not the only mechanical mistake in the typed affidavit.

"Quantity," for instance, was spelled "quanitty."

the Court was surprised that counsel would press this argument to the extreme lengths he did at the hearings on this matter: the Law is not a game played to gain delays and debating points; it is a search after the truth.

■ 3. The defendant contends that the above affidavit does not justify a finding that there was probable cause for the issuance of the search warrant, because it was based upon hearsay. On this point, the affidavit speaks for itself, and shows full compliance with the standard set forth in Jones v. United States, 362 U.S. 257, 269–72, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The defendant was known to the Narcotic Squad as a convicted narcotic violator and an admitted narcotic user; three of the four "sources" were specifically described as "reliable;" and the officers carried out personal observations which fully corroborated the information they had received. Thus, "a substantial basis for crediting the hearsay" was presented. 362 U.S. at 269, 80 S.Ct. at 735.

■ 4. The defendant contends that the warrant issued on the basis of the above affidavit was the "fruit" of a warrant issued on May 8, 1962; that the earlier warrant was illegal; and that the evidence seized under the present warrant must therefore be suppressed. After hearing a motion to suppress specifically directed at the earlier warrant in Criminal Case Number 518–62, this Court has today filed a memorandum finding the earlier warrant completely legal and denying the motion to suppress in that case. In any event, the only item in the instant warrant related to the earlier warrant was the defendant's address. (Tr. IV, 5–6.) The connection between the two is, therefore, far too attenuated for this Court to consider the second the "fruit" of the first. See Gregory v. United States, 97 U.S.App.D.C. 305, 231

F.2d 258 (1956), cert. denied 352 U.S. 850, 77 S.Ct. 69, 1 L.Ed.2d 61 (1956).

■ 5. The defendant contends that the warrant was illegally executed because the police failed to state their purpose and authority and failed to be refused entry before breaking into the premises. The Court finds, however, that the search warrant was executed in full compliance with 18 U.S.C. § 3109.[4] The Court adopts the version of the facts as narrated by Detective Didone, who testified that he and Detective Paul approached the rear door of the premises, found it open, observed the defendant inside, announced in a loud voice that they were police and had a search warrant, and entered when the defendant failed to come toward the door. (Tr. II, 108–9.) There is not the slightest doubt that the defendant saw the officers, heard what they said, refused to admit them, and would have continued to refuse if the officers had not then entered through the open door. There is no credible testimony indicating that any door was broken.

■ 6. The defendant contends that because $157 in cash was seized and because cash was not one of the items listed in the search warrant, all the evidence seized under the warrant must be suppressed. The Court knows of no case which has held that the seizure of *some* items in excess of those specified must result in the suppression of *all* items seized, whether permitted or not. Indeed, the language of Rule 41(e) is directly to the contrary. It provides that if *"the property* seized is not that described in the warrant," then *"the property* shall be restored unless otherwise subject to lawful detention and *it* shall not be admissible in evidence at any hearing or trial." Rule 41(e), Fed.R. Crim.P. (Emphasis added.) Such language requires an item-by-item consideration, and an illegal seizure of one item does not reflect upon the legal sei-

---

4. "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant." 18 U.S.C. § 3109.

zure of another. The defendant has already made an appropriate motion for the return of the cash, and that motion was granted on May 21, 1962. The evidence legally seized will not be suppressed because of the seizure of the cash.

The motion to suppress will therefore be denied.