117 N.J. Super. 276 (1971)
284 A.2d 385
STATE OF NEW JERSEY, PLAINTIFF,
v.
MARIO MOLINARO, ROCCO CICCHETTI, EMANUEL MONTALBANO, PETER VERDICCHIO, AND ROCCO MAURIELLO, DEFENDANTS. STATE OF NEW JERSEY, PLAINTIFF,
v.
ANTHONY DE PASQUE, ROSE MARIE RENNA, PETER CARLO, FRANK GRAZIANO, SHIRLEY HUDSON, JOHN F. INGUAGGIATTO, DEFENDANTS. STATE OF NEW JERSEY, PLAINTIFF,
v.
RICHARD PTAKOWSKI, ROBERT PIERSON, ROBERT J. CREMEN, FRED HERZOG, JOSEPH HOLLINGER, AND JOSEPH GARCIA, DEFENDANTS.
Superior Court of New Jersey, Essex County Court, Law Division (Criminal).
Decided November 24, 1971.
*278 Mr. Richard B. McGlynn, Deputy Attorney General, appeared for plaintiff (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
Mr. John P. Russell, appeared for defendant Mario Molinaro (Messrs. Russell & McAlevy, attorneys).
Mr. Frank A. Paglianite, appeared for defendant Rocco Cicchetti.
Mr. Harvey Weissbard, appeared for defendant Emanuel Montalbano (Messrs. Querques, Isles & Weissbard, attorneys).
Mr. Elmer J. Herrmann, Jr., appeared for defendants Peter Verdicchio and Rocco Mauriello (Messrs. Blasi & Herrmann, attorneys).
*279 Mr. James G. Leonardson, appeared for defendants Frank Graziano and Robert Cremen (Messrs. Stein, Bliablias & Goldman, attorneys).
Mr. Gerald Goldman, appeared for defendant Shirley Hudson (Messrs. Goldman, Carlet & Garrison, attorneys).
Mr. Charles K. Kurebanas, appeared for defendant John F. Inguaggiatto.
Mr. Donald Friedman, Assistant Deputy Public Defender appeared for defendant Richard Ptakowski (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Anthony P. Peduto, appeared for defendant Robert Pierson.
Mr. Thomas C. Brown, appeared for defendant Fred Herzog.
Mr. Joseph G. Dooley, Jr., appeared for defendant Joseph Garcia (Thomas E. Durkin, Jr., attorney).
HANDLER, J.S.C. (temporarily assigned).
These are three groups of cases (referred to herein as the Molinaro case, the Ptakowski case and the De Pasque case) in which defendants stand indicted by the State Grand Jury for various gambling offenses. Evidence was obtained through the interception of telephonic communications by the New Jersey State Police under the New Jersey Wiretapping and Electronic Surveillance Control Act, L. 1968, c. 409; N.J.S.A. 2A:156A-1 et seq. Defendants have brought motions to suppress evidence which have been consolidated because they share a single overriding issue.
The indictments charge conspiracy to violate the gambling laws as well as substantive gambling offenses. Each group of cases was initiated by an application for authorization to intercept telephonic communications submitted by the Attorney *280 General. The application in each case was based upon an affidavit made by a detective of the New Jersey State Police who had engaged in an investigation of suspected offenses. Each affidavit recites the receipt of information from a reliable informant that illegal gambling operations involving bookmaking and lottery were being conducted over particular telephone facilities by an unknown male and other unidentified persons on a daily basis between certain hours. The bookmaker or gambler operating from the particular telephone, while not known to the informant, was said to be associated with other unknown persons or conspirators as part of a larger gambling enterprise. The affidavit further states that on several occasions in the presence of the detective the informant placed bets with the unknown individual over the particular phone. The locations of the particular phones were determined and placed under surveillance. Each affidavit indicates that conventional investigative techniques would be unavailing and also contains a statement that gambling would continue to occur over the particular subject phone and that it was therefore necessary to intercept more than initial conversations and to maintain the interception for not longer than 15 days. Upon these applications orders containing appropriate factual determinations were entered authorizing the interception of telephonic communications. In two of the investigations, upon further application, the interceptions were extended beyond the initial period. Thereafter, utilizing the information obtained, affidavits for search warrants were prepared, the warrants were issued and upon their execution defendants were apprehended, charged and subsequently indicted.
The pivotal issue involves N.J.S.A. 2A:156A-12 (f). This states that "[e]very order entered under this section shall require that such interception * * * be conducted in such a manner as to minimize or eliminate the interception of such communications not otherwise subject to interception under this act." On these motions it is contended by all *281 defendants that the interceptions were unlawful and that all direct and derivative evidence must therefore be suppressed. More pointedly, they urge that in conducting the interceptions herein, every single conversation expressed over the various telephones during the interceptions was overheard and recorded without regard to its content or the identity of the participants, and that this was a violation of N.J.S.A. 2A:156A-12(f).
The position of the State was articulated by Deputy Attorney General Stier, a co-director of the Organized Crime and Special Prosecutions Section of the New Jersey Division of Criminal Justice. He testified that he was responsible for the implementation of the Wiretap Act on behalf of the State Police and that he was mindful of the requirements of N.J.S.A. 2A:156A-12(f). He explained that once a wiretap order has been obtained, the physical location of the monitoring operation or plant is determined and the tape recording machine is then put into operation. At the beginning of each monitoring day the assigned police officer brings a fresh reel of tape and places it on the machine which is then turned on. The device for interception works automatically and is activated by any incoming or outgoing call. The machine is not left unattended in an operating position. The monitor usually has a set of earphones which is plugged into the tape machine and he listens to the telephone conversations through the earphones at the same time the tape machine is recording it. The monitor is instructed explicitly that once monitoring has commenced every conversation is to be overheard and recorded in its entirety. In addition to listening to the intercepted conversations, the monitor also prepares a daily log of each day's interceptions. This log when completed discloses whether a call is incoming or outgoing, the time of the call, the telephone numbers of outgoing calls, a brief synopsis of the contents of each call, the numerical reading of the mechanical counter on the tape machine at the time each call terminated, and a designation as to whether the conversation was "non-pertinent" *282 in the opinion of the monitor. Each daily log also indicates the time at which monitoring was begun and completed for the day. When monitoring is completed for the day the monitor removes the reel and seals the tape for transmittal to the Electronic Surveillance Unit at New Jersey State Police Division Headquarters in West Trenton, New Jersey.
Stier stated further that a detective working under a superior officer is primarily responsible for all phases of a particular investigation including the wiretap. Detectives assigned in these cases have received special training in organized crime and illegal gambling operations. Additionally, a lawyer who is a Deputy Attorney General assists the investigating detective and his superior officer in the preparation of wiretap applications and affidavits and actively participates in policy decisions connected with the investigation. These three individuals consult together daily during the course of a wiretap with a view toward evaluating the quality of the information obtained through the wiretap as well as other investigative sources. The logs for each day's conversations are reviewed. According to Stier, a policy to be followed in these daily reviews is to determine the hours during which there is the greatest likelihood that the subject telephone will be used for illegal activity; it is thus hoped that monitoring can be undertaken during the time of day when the incidence of incriminatory or evidentiary conversations will be highest. It was contended that this review satisfied the requirements of N.J.S.A. 2A:156A-12(f).
As noted, the critical terms of N.J.S.A. 2A:156A-12(f) are that "the interception of such communications not otherwise subject to interception" under the Wiretap Act be minimized or eliminated. Reference must be made to section 8 of the act which delineates those communications which may be subject to interception. As pertinent to these cases they are communications which would "provide evidence of the commission of the offense of * * * gambling * * * or any conspiracy to commit [such offense] * * * or which *283 may provide evidence aiding in the apprehension of the perpetrator of * * * [such offense]." N.J.S.A. 2A:156A-8. The original orders and renewal orders authorizing wiretapping in all three cases herein included the language required by section 12(f). An example is the order entered in the Ptakowski case which provided, in pertinent part, that "said interception will * * * be conducted in such a way as to minimize or eliminate the interception of communications other than the type described hereinabove." The "type [of communications] described hereinabove" according to the order referred to "an unknown male and other unknown persons [who] are engaging over a period of time as part of a continuing criminal activity in, and are committing, have committed and are about to commit the offenses of book-making, N.J.S. 2A:112-3, conspiracy, N.J.S. 2A:98-1 and 2, and lottery, N.J.S. 2A:121-3; [and] communications evidentiary of such offenses will be obtained through the interception applied for * * *." The communications thus described in the orders were ones which clearly are subject to interception under the Wiretap Act. The question, therefore, is whether communications not so described were intercepted by the State Police and whether, under the language of section 12(f) of the act and the implementing orders, the interceptions must be deemed unlawful.
In the construction of legislation, words and phrases are normally given their generally accepted meaning or common significance. N.J.S.A. 1:1-1; Lane v. Holderman, 23 N.J. 304 (1957). Among the common meanings ascribed to "eliminate" are to remove, expel, exclude, leave out of consideration, or to ignore. 1 Webster, New International Dictionary of the English Language 832 (2d ed. unabridged 1956). "Minimize" has been construed as meaning to make as slight as possible or to reduce to the smallest possible amount or degree. Cf. People v. Kiser, 112 Cal. App. 2d Supp. 903, 245 P.2d 1125 (App. Dep't Super. Ct. 1952); Ex parte Trafton, 160 Tex. Cr. R. 407, 271 S.W. 2d 814 (Ct. Crim. App. 1953). So understood, it would *284 appear to be the intent of the Legislature expressed by N.J.S.A. 2A:156A-12(f) that the wiretapping of telephone calls in the context of a gambling investigation should be undertaken so that "communications not otherwise subject to interception," i.e., communications which do not directly or indirectly pertain to gambling activities or to persons engaged in gambling or which would not be helpful in securing the arrests of such persons, either be excluded entirely from the interception or in the alternative be included only to the slightest degree or smallest extent possible.
Defendants contend that the practice of the State Police to monitor and record every conversation occurring during the hours when a wiretap is conducted necessarily results in the acquisition of communications which would not be authorized by the act to be intercepted. According to the logs compiled during the electronic surveillance in the Molinaro case, approximately 45% of the total calls monitored were characterized as "n/p" or nonpertinent. (The State concedes only that approximately 31% of the total communications intercepted were characterized as nonpertinent by the intercepting officers.) In the Ptakowski case only 16 out of a total of 594 conversations were noted as "n/p." In the De Pasque case some 58 of approximately 1296 communications were characterized as being nonpertinent. Judging from the numerical count as noted in the logs for these two cases all "n/p" calls with few exceptions were brief. The characterization of a call as being "n/p" or nonpertinent reflects merely the subjective judgment of the monitor as to the quality of the call. It does not therefore demonstrate conclusively that such a communication was nonevidentiary or not a proper subject for lawful interception.
Conversations were played to underscore the point that the State Police procedure did in fact result in the inclusion of nonsubject communications in the interceptions. Thus, in the Molinaro case there were representative calls which *285 clearly did not in any way pertain to criminal activities. There were many lengthy conversations between children in which they exhibited typical youthful interest in shopping, clothes, fashions, hair styles, gifts, parties, social events, family outings, games, sports, friends, classmates, teachers, homework, school situations, religious school and music lessons. In other instances adult females discussed prosaic subjects such as draperies, getting their hair done, buying clothes, their children's problems at school, food and cooking, bingo, relatives, racial attitudes and church membership. In contrast, in the Ptakowski case there were few if any communications brought to the court's attention which could clearly or unequivocally be regarded as unrelated to criminal matters notwithstanding a "nonpertinent" designation; and those which might be so viewed were brief conversations engaged in by persons who were prime suspects. In the De Pasque case there were several short conversations of a personal and noncriminal nature, but these involved mostly the prime criminal suspect. From this sampling it would appear that the number and type of nonsubject or nonevidentiary calls that will in fact be intercepted as a result of a procedure to overhear and record every communication during a wiretap will depend upon the particular circumstances and will vary from investigation to investigation. Upon these motions, however, the contention is sufficiently founded that the methodic practice of the New Jersey State Police to record every conversation uttered in the course of an interception without regard to its investigative quality will usually result in the interception of some conversations which are not evidentiary or meaningful to the criminal investigation.
Section 12 (f) of the Wiretap Act in crystal terms prohibits the purposeful interception of nonsubject communications. There is naught in the history of this legislation which would induce a contrary interpretation. The act, as pointed out in previous decisions (State v. Sidoti, 116 N.J. Super. 70 (Law Div. 1971) and State v. Christy, 112 N.J. *286 Super. 48 (Law Div. 1970)), was designed to meet the minimum requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. It also incorporated certain provisions of a model state statute. In many ways it is more stringent than its forebears. State v. Sidoti, supra. The comparable federal provision treating nonsubject communications enjoins that their interception be "minimized," 18 U.S.C. § 2518(5); it does not prescribe that such communications be "eliminated." The model state statute is stricter than the Federal Omnibus Act in that it proposed a restriction upon the interception of nonsubject communications substantially similar to N.J.S.A. 2A:156A-12(f). Blakey and Hancock, "A Proposed Electronic Surveillance Control Act," 43 Notre Dame Lawyer 657, 674 (1968).[1] No other state which has authorized electronic surveillance imposes the stringent New Jersey requirement that the interception of nonsubject communications be either eliminated or alternatively minimized in the conduct of a wiretap.[2]
*287 In the adoption of the New Jersey Wiretapping and Electronic Surveillance Control Act, the New Jersey Legislature attempted to be scrupulous about the protections which it fashioned for individual privacy. It adopted a broad definition of what constituted a private communication entitled to legislative and judicial care N.J.S.A. 2A:156A-2(b). The Senate Committee conceived that the proposed act was strictly limited to prevent abuses by subjecting official action to tight court supervision and control. Senate Committee on Law, Public Safety and Defense, "Report on Senate No. 897 Electronic Surveillance 4-5" (Oct. 29, 1968).
The concern for preserving individual privacy from untoward electronic intrusion, reflected in decisions of the United States Supreme Court, Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), was shared by the New Jersey Legislature. State v. Sidoti, supra, 116 N.J. Super. at 80. In Berger v. New York, the United States Supreme Court declared unconstitutional a New York statute under which an electronic surveillance through the installation of a listening device in an attorney's office had been authorized. The Supreme Court considered as the signal vice of the electronic surveillance therein authorized its failure in any way to prune from the interception communications which were in no way connected with the subject of the investigation. There was no provision in the state statute, no judicial directive in the authorizing order, and no discretion voluntarily exercised by executing officers to exclude unrelated communications from the electronic surveillance. As a result the court noted that the "conversations of any and all persons coming into the area covered by the device will be seized indiscriminately and without regard to their connection with the crime under investigation." 388 U.S. at 59, 87 S.Ct. at 1883-1884, 18 L.Ed.2d at 1052 (emphasis added).
*288 In Katz v. United States, supra, federal agents had installed a listening device covering a public telephone. The resultant evidence was suppressed because of the absence of prior judicial sanction. The Supreme Court nevertheless approved the sedulous manner in which the executing officers eliminated and avoided overhearing any communications not pertaining to the gambling investigation. The agents "took great care to overhear only the conversations of the petitioner himself" and "[o]n the single occasion when the statements of another person were inadvertently intercepted, the agents refrained from listening to them." 389 U.S. at 354, 355, 88 S.Ct. at 512-513, 19 L.Ed.2d at 583-584 (emphasis added) Cf. Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966).
Other cases have recognized that an electronic surveillance must be undertaken in a manner reasonably calculated to exclude communications other than those necessary to further the objects of the criminal investigation. In United States v. Escandar, 319 F. Supp. 295 (D.S.D. Fla. 1970), for example, the court upheld an electronic surveillance involving a public telephone located in the lobby of the apartment building in which the suspect lived. The wiretap order itself provided that interception be undertaken only when the suspect was in the building and only when it was determined by "voice recognition" that he was actually using the telephone. 319 F. Supp. at 297. Compare, State v. Sidoti, supra. In Cross v. State 225 Ga. 760, 171 S.E.2d 507 (1969), it was held that the failure of the order and renewal order authorizing a wiretap of a defendant's telephone line to conform to the federal requirements of 18 U.S.C. § 2518(4) (e) and § 2518(5) and to require, among other restrictions, that the surveillance be conducted in such a way as to minimize the recording of communications not otherwise subject to interception, rendered evidence obtained as a result thereof unlawful. In United States v. Scott, 331 F. Supp. 233 (D.D.C. 1971) the question was whether the limiting provision of 18 U.S.C. § 2518(5) provided in the order was *289 followed by the monitoring agents in a narcotics investigation. The supervising agent testified that he understood the order to restrict the interception to conversations relating to narcotics. The record revealed, however, that virtually all conversations were overheard and recorded; approximately 60% of the calls intercepted were completely unrelated to narcotics and certain monitored conversations could not possibly have involved drugs. The court, in holding that the interceptions thus undertaken were unlawful, noted that "[t]he record is devoid of any attempt, no matter how slight, to minimize the interception of unauthorized calls." (331 F. Supp. at 247).
The State contends that the statute should not be construed to require the exclusion of any communication during the course of an interception, and that once the monitoring is initiated every single communication should be recorded. It was argued that to exclude any conversations even though not otherwise subject to interception might be considered an alteration or editing of a recording in violation of N.J.S.A. 2A:156A-14. If, however, section 12(f) demands that such conversations not be intercepted, their exclusion or reduction in conformity to that requirement could not be regarded as an alteration or editing of the recording in violation of section 14. Section 14 prohibits the adulteration of properly intercepted conversations after they have been recorded.
The major reason assigned for the State's policy was a desire not to leave the monitoring officer with the ultimate decision as to what would be recorded. Stier gave illustrations of possible conversations which would make such decisions difficult. With respect to the conversations actually overheard and recorded in the Molinaro case, however, the detective in charge of the investigation and the wiretap was aware that there were many lengthy personal nonevidentiary calls and that there was no difficulty in discerning when these calls were in progress or in recognizing these conversations *290 as being remote to the criminal activities under investigation.
Moreover, the procedure of the State Police to overhear and record every telephone conversation in its entirety once the daily monitoring has commenced, is not followed uniformly by other law enforcement bodies. Stier acknowledged this. The Essex County Prosecutor, for example, instructs its officers to eliminate or minimize the recording of noncriminal calls. The monitor makes a judgment when he hears a conversation as to whether or not that conversation is incriminatory in nature or needful in terms of the investigation. If he concludes that it is not, he is instructed to turn off the recording part of the machine and not listen to the conversation. The efforts of the Essex County Prosecutor to garner evidence and prosecute crime have not been frustrated by adhering to the stricture of N.J.S.A. 2A:156A-12 (f).
It goes too far to argue that police officers are incapable of shouldering a discretion which entails the recognition of the criminal investigative value of a telephone call. In order to conduct a wiretap or electronic surveillance under the New Jersey Wiretap Act officers must be specially trained. N.J.S.A. 2A:156A-10. Additionally, in these gambling cases the detectives were schooled in organized crime and illegal gambling operations. Moreover, the act invests executing officers with vital discretion in other areas. Under N.J.S.A. 2A:156A-12(f) the authorized interception must begin and terminate as soon as practicable; the interception must be terminated when in the judgment of the executing officers the wiretap is no longer necessary under the circumstances. See State v. Christy, supra, 112 N.J. Super. at 59, 76, 77. In effect, the exercise of discretion in executing a wiretap is inescapable. As Stier stated, the monitoring officer must pay continuous critical attention to the content and quality of each communication during a wiretap and be prepared to act upon this information. The officer also makes a contemporaneous working record or log of each *291 communication that is overheard; he decodes the telephone numbers of outgoing calls; he must discern whether particular conversations are "nonpertinent" and which are particularly important to the investigation and require further investigative efforts; he must be alert to new or unusual developments which might extend the investigation or take it into other channels.
Section 8 of the Wiretap Act defines in a manner generous to law enforcement goals those communications which lawfully may be made the subject of electronic surveillance. Communications which provide evidence of the commission of various enumerated offenses can be the target of a surveillance. Additionally, communications relating to offenses other than those initially suspected and authorized may also be intercepted and utilized by law enforcement officers. N.J.S.A. 2A:156A-18; accord, United States v. Cox, 449 F.2d 679 (10 Cir.1971). Section 8 further permits seizure of communications helpful in apprehending persons committing crimes. Thus, ostensibly non-criminal conversations (such as those hypothesized by Stier), which circumstantially tend to establish the identity of unknown suspects, or map the daily routines of the criminal activists, or provide data for further physical surveillances or investigated forays, or furnish information needed in the preparation and execution of search and arrest warrants, would be within the ambit of an electronic surveillance. Ruses or subterfuges to conceal incriminating conversations may be realistically countered. If it were suspected that incriminatory matters were being masked by jargon or codes or covertly interspersed with innocuous talk, the overhearing and recording of such conversations in their entirety might be justified under the circumstances.
A policeman is expected and required to exercise a wide and varied discretion in the performance of his duties. See Davis, Discretionary Justice: A Preliminary Inquiry 222-224 (1969); The President's Commission on Law Enforcement and Administration of Justice, "Task Force Report: *292 The Police," 13-35 (1967). Examples are myriad. A police officer must use good sense in deciding when and how to investigate a crime or when to arrest a suspect. E.g., State v. Braxton, 111 N.J. Super. 191 (App. Div. 1970), rev'd 57 N.J. 286 (1970); State v. Bell, 89 N.J. Super. 437 (App. Div. 1965); State v. Hope, 85 N.J. Super. 551 (App. Div. 1964). The use of force in effectuating arrest requires sound judgment. E.g., State v. Mulvihill, 57 N.J. 151 (1970); State v. Washington, 57 N.J. 160 (1970); State v. Fair, 45 N.J. 77 (1965); State v. Owens, 102 N.J. Super. 187 (App. Div. 1968), mod. 54 N.J. 153 (1969), cert. den. 396 U.S. 1021, 90 S.Ct. 593, 24 L.Ed.2d 514 (1970). The search and seizure of evidence of crime in the absence of a judicial warrant is a highly discretionary act. E.g., State v. Cox. 114 N.J. Super. 556 (App. Div. 1971), certif. den. 58 N.J. 93 (1971); State v. Boone, 114 N.J. Super. 521 (App. Div. 1971); State v. Dennis, 113 N.J. Super. 292 (App. Div. 1971), certif. den. 58 N.J. 337 (1971). Even when armed with a search warrant, officers must be discriminate in seizing that which is permissible. E.g., Mesmer v. United States, 405 F.2d 316 (10 Cir.1969); United States v. Escandar, supra; United States v. Harrison, 319 F. Supp. 888 (D.N.J. 1970); State v. Seefeldt, 51 N.J. 472, 490 (1968).
It should not be thought a remarkable attribute of an officer's authority in conducting an interception under the Wiretap Act that he be discriminate, discerning and sensitive to communications which do not in any way relate to criminal activities or would not assist in the apprehension of criminal suspects. If it is manifest to the officer that he is attending such a conversation, it would not seem unreasonable that he desist from further eavesdropping. The New Jersey Legislature has recognized the competing values of individual privacy and the need of law enforcement personnel to utilize electronic surveillance in dealing with crime. It has struck the balance by mandating that telephone conversations shall not be overheard or recorded if and when *293 it becomes clear in the mind of the executing officer exercising reasonable judgment under all the circumstances that such conversations do not in any way pertain to the objects of the criminal investigation. This is what N.J.S.A. 2A:156A-12 (f) means. The New Jersey State Police intentionally opted to defy this requirement by purposefully including in their interceptions every conversation uttered regardless of its investigative worth. It is patent that they have violated the command of the statute.
N.J.S.A. 2A:156A-21 provides that a motion to suppress may be brought where it is contended that an interception was conducted in violation of the statute or the order authorizing the interception. In the Ptakowski and De Pasque cases, while the State Police procedure to record every conversation regardless of content was applied, this did not in fact result in the acquisition of any substantial number of nonsubject communications. Virtually all of the conversations in the Ptakowski case and almost all of those in the De Pasque case were criminal. By sheer coincidence the evil which section 12 (f) was designed to deter did not actually occur. The impermissible invasion of privacy in these cases was negligible. It should follow therefore that the evidence of crime derived from the interceptions undertaken in these cases under the Wiretap Act not be suppressed. Cf. United States v. Langford, 303 F. Supp. 1387 (D. Minn. 1969); United States v. Castle, 213 F. Supp. 56 (D.D.C. 1962), aff'd 120 U.S. App. D.C. 398, 347 F.2d 492 (D.C. Cir.1964), cert. den. 381 U.S. 929, 85 S.Ct. 1568, 14 L.Ed.2d 687 (1965); State v. Rulli, 116 N.J. Super. 120 (App. Div. 1971).
The Molinaro case is in a different posture. The State Police practice to record every conversation indiscriminately did in fact result in the acquisition of a substantial number of nonsubject calls. The evil to be forestalled by section 12(f) was not fortuitously avoided, as in the Ptakowski and De Pasque cases. The impermissible invasion *294 of privacy was extensive. The Molinaro interceptions are therefore clearly unlawful.
Where evidence has been seized unlawfully, suppression of that evidence at trial ordinarily follows. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), reh. den. Ivanov v. United States, 394 U.S. 939, 89 S.Ct. 1177, 22 L.Ed.2d 475 (1969), app. after remand United States v. Alderisio, 424 F.2d 20 (10 Cir.1970), on remand United States v. Butenko, 318 F. Supp. 66 (D.N.J. 1970). This doctrine of suppression is a court-authored remedy. State v. Zito, 54 N.J. 206 (1969); Farley v. $168,400.97, 55 N.J. 31 (1969). Where, however, evidence stems from an unlawful wiretap, suppression of such evidence is the remedy selected specifically by the Legislature, viz:
If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall not be received in evidence in the trial, hearing or proceeding. [N.J.S.A. 2A:156A-21]
With respect to the appropriate sanction for an unlawful electronic surveillance, the New Jersey Act follows the model state statute. Blakey and Hancock, "A Proposed Electronic Surveillance Control Act," 43 Notre Dame Lawyer, supra at 679-680. The Federal Omnibus Act is comparable, 18 U.S.C. § 2515. The statutes of other states which have permitted official electronic surveillance are also uniform in requiring suppression of evidence as the penalty for illegal wiretapping. Thus, all jurisdictions which have authorized official electronic surveillance, including New Jersey, have imposed as the onus for an illegal wiretap the exclusion of evidence derived therefrom in any trial.[3] In *295 United States v. Scott, supra, the court held that the failure of the surveilling agents to abide by the crucial command of the authorizing order to "minimize the interception of communications not otherwise subject to interception," required the suppression of evidence. In so doing the court stated that if it "were to allow the Government agents to indiscriminately intercept every conversation made and to continue monitoring such calls when it becomes clear that they are not related to the `authorized objectives' of the wiretap and in violation of the limiting provisions of the order such order would become meaningless verbiage and the protections to the right of privacy outlined in Berger and Katz would be illusory." (331 F. Supp. at 248).
Arguably, the judiciary in a different setting could abandon or modify the exclusionary doctrine since this rule originated with the courts. Cf. State v. Zito, supra. It has been suggested, however, that it is also within the power of a legislative body to adopt or negate a rule of suppression. See Wolf v. Colorado, 338 U.S. 25, 33, 69 S.Ct. 1359, 1364, 93 L.Ed. 1782, 1788 (1948). With respect to evidence derived from an unlawful electronic surveillance, the New Jesey Legislature by N.J.S.A. 2A:156A-21 has instituted such a rule.
For the reasons expressed herein, the motions in the Ptakowski and De Pasque cases are denied; the motions in the Molinaro case are granted.
NOTES
[1] Since the co-author of the model state statute is credited in large measure with the drafting of the American Bar Association's Project on Minimum Standards for Criminal Justice, "Standards Relating to Electronic Surveillance" (June 1968), it is of passing interest to note the ABA's proposal with respect to nonsubject communications. The ABA provided that such communications be eliminated or minimized, but this restriction was confined to a surveillance over "public facilities." While the terminology of section 12(f) of the New Jersey Statute is identical to the language of the ABA proposal, it goes further than the ABA proposal in that it imposes this restriction upon "every order" for an interception, and not merely for an interception applicable to a public telephone.
[2] No state requires such nonsubject communications be "eliminated." Five states require that they be "minimized." See Connecticut P.A. No. 68 (1971); Fla. Stat. Ann. § 934.09(5) (1968); Minn. Stat. Ann. § 626A.06(4)(h) (1969); N.H. Rev. Stat. ch. 570-A:9 (1969); N.Y. Criminal Procedure Law § 700.30 (1971). Colorado requires that interceptions be conducted in such a way as to minimize permissible interceptions. Col. Rev. Stat. 1963, 40-4-30(6) (1969). Three other states which authorize electronic surveillance do not require that the interception of nonsubject conversations be minimized. See Arizona Rev. Stat. § 13-1051 (1968); Mass. Ann. Law ch. 272 § 99 (1968); Ga. Code Ann. § 26-3004 (1967).
[3] The ABA, Project etc., "Standards Relating to Electronic Surveillance," supra at 113-114 proposed a variant solution to ameliorate the exclusionary rule, viz.:

§ 2.3 Evidentiary sanctions.
* * *
(d) Substantial rights; excusable error. An error not affecting substantial rights in an application, authorization, or overhearing or recording of the other wise authorized overhearing or recording of wire or oral communications should not be grounds for the suppression of such communications or evidence derived therefrom. Excusable error made in the process of securing authorization for the overhearing and recording of such communications should be subject to cure by judicial ratification.
It adhered, however, to the rule of total exclusion when this particular subsection was deleted from its final draft. Ibid., (Supplement March 1971) 8-11.