116 N.J. Super. 70 (1971)
280 A.2d 864
STATE OF NEW JERSEY, PLAINTIFF,
v.
PHILLIP A. SIDOTI, NICOLA AURIEMMA, RITA AURIEMMA, JOHN A. GUANCIONE, AND RAYMOND DE FILLIPIS, DEFENDANTS.
Superior Court of New Jersey, Essex County Court, Law Division (Criminal).
Decided July 29, 1971.
*72 Mr. John A. Matthews, III, Assistant Prosecutor, for plaintiff (Mr. Joseph P. Lordi, Prosecutor of Essex County, attorney).
Mr. Donald S. Goldman for defendant Sidoti (Messrs. Goldman, Goldman & Caprio, attorneys).
Mr. Paul Alongi for defendants Auriemma (Messrs. Alongi & Bregg, attorneys).
Mr. C. Robert Sarcone for defendant Guancione.
Mr. John P. Russell for defendant De Fillipis (Messrs. Russell & McAlevy, attorneys).
*73 HANDLER, J.S.C.
Defendants Phillip A. Sidoti, Nicola Auriemma, Rita Auriemma, John A. Guancione and Raymond De Fillipis were indicted by the Essex County grand jury for conspiracy to violate the gambling laws. Several of them were also charged with so-called substantive offenses, such as the possession of lottery slips, maintaining a gambling resort, working for a lottery and bookmaking. Another defendant, Dominic Spataro, was indicted separately for related gambling offenses by the Hudson County grand jury.
On May 28, 1970 a sworn application was submitted by the Essex County Prosecutor pursuant to the New Jersey Wiretapping and Electronic Surveillance Control Act, L. 1968, c. 409; N.J.S.A. 2A:156A-1 et seq., for judicial authorization to intercept wire communications over certain public telephone facilities. An order authorizing such electronic surveillance was issued on the same date. A second application was made on September 14, 1970 to intercept wire communications over a nonpublic telephone facility. An order authorizing this interception was issued the next day. After intercepting numerous telephonic communications pursuant to this second order, a sworn application for search warrants was made on October 2, 1970 covering one Phillip Sidoti, his motor vehicle and approximately ten different premises. The search warrants issued and were duly executed, with the resultant seizures of evidence and arrests.
The original application of May 28, 1970 was submitted by a lieutenant of detectives in the prosecutor's office. It concerned the suspected illegal gambling activities of one Nicholas Mitarotonda and other "unknown persons," and their use of two public telephones to relay gambling information. It stated that "[i]n order to identify such individuals working for and associated in this illegal gambling operation, it will be necessary to intercept telephonic conversations over public telephone facilities number (201) 748-9849 and (201) 748-9896, located at the corner of North 15th Street and Chester Avenue, Bloomfield, New Jersey." It *74 further stated that "any sustained surveillance is impossible, because a strange vehicle parked in the neighborhood or a strange individual on foot would be noticed and the security of the investigation would be jeopardized." Also, that "individuals at this level generally will conduct their business by telephone to avoid contact with other bettors or operators working in the gambling operation which can be detected by surveillances." Because of these facts and the interception of telephone conversations would disclose the substance of discussions between the persons in the wagering enterprise, it was claimed "a special need exists to intercept conversations over public telephone facility numbers (201) 748-9849 and (201) 748-9896."
This application incorporated an affidavit made by an investigator in the prosecutor's office. The affidavit recited information which had been received from an informant concerning this gambling activity. According to the affidavit, the investigator met with his informant on May 6, 1970, who pointed out the suspect Mitarotonda and "other white males." These persons were observed utilizing an "Armstrong sheet" and engaging in conversation pertaining to the business of horse racing; the suspect was seen to enter the phone booth, place a call and engage in a conversation for about a minute; he accepted cash from these individuals sometimes before and sometimes after placing the call. This occurred six or seven times between 11:30 A.M. and 12:30 P.M. It was further stated that "phone activity was conducted among the aforesaid white males until surveillance ceased at 3:00 P.M." Similar activity was observed on the following day, May 7, when the suspect arrived at approximately 11:30 A.M. In addition, the investigator, by entering one of the two phone booths, personally overheard the suspect call from the other phone booth a "type of bet that can only be placed with a bookmaker." On May 8 the suspect arrived at approximately 11:40 A.M.; the same type of activity was observed and the investigator also was able to overhear "conversations * * * all relating to horse * * * *75 and lottery bets." On May 9, the last day of the surveillance, this pattern of activity was observed between the hours of 11:30 A.M. and 3:00 P.M., during which the suspect Mitarotonda and others would make "frequent phone calls of short duration and have conversations pertaining to placing of horse and lottery bets" and exchange cash. The investigator expressed the opinion that "the individuals described are either bettors and/or bookmaker's runners, who are placing bets via the use of public telephone[s] * * * to bookmakers whose locations are unknown at this time."
On this showing the court determined there was a "special need" and authorized the Essex County Prosecutor's Office "to intercept the wire communications of unknown males engaging in a bookmaking and lottery operation relating to the offenses of Bookmaking (N.J.S. 2A:112-3), Lottery (N.J.S. 2A:121-3 and 4), Conspiracy (N.J.S. 2A:98-1 and 2) from public telephone facility (201) 748-9849 and (201) 748-9896 listed to the public telephone booths located at the intersection of North 15th Street and Chester Avenue, Bloomfield, New Jersey." It further provided that the "interception will begin and end as soon as practicable and be conducted in such a way as to minimize or eliminate the interception of communications other than the type described hereinabove; said interception shall terminate no later than thirty days from the beginning of interception."
Defendants have brought motions to suppress all evidence, including most particularly the communications intercepted as a result of both wiretap orders. The motions have now been pared to the singular contention that the initial sworn application and affidavit did not demonstrate a basis upon which the court could determine the existence of "special need" for wiretap on the public telephones, and therefore the order was contrary to N.J.S.A. 2A:156A-11. Merged in this contention is the argument that the showing of probable cause was insufficient to justify an electronic surveillance over the two public telephones in the broad and unrestricted manner permitted by the order of May 28, 1970, *76 and therefore violated the Fourth Amendment of the Federal Constitution prohibiting unreasonable searches.
The pertinent statutory provision is N.J.S.A. 2A:156A-11, viz:
If the facilities from which a wire communication is to be intercepted are public, no order shall be issued unless the court, in addition to the matters provided in section 10 above, determines that there is a special need to intercept wire communications over such facilities.
This language clearly indicates that the standard of "special need" was intended to supplement those encompassed in section 10 of the act. Section 10 fashions the general requirements for any proposed interception of oral or wire communications. The facility must be designated and there must be a judicial determination based upon adequate facts of its use in connection with the particular offense or its leasing, listing or common use by the suspect; the recent or "continuing criminal activity" of the "person whose communication is to be intercepted"; the likelihood that the interceptions will reveal conversations concerning the offense; and the inutility of conventional investigative techniques. What was intended in section 11 to be embraced by "special need" as an addendum to these standards imposed by section 10 is not self-relevatory. Under such circumstances an examination of "the pertinent constitutional and legislative history for aid in ascertaining the true sense and meaning of the language used" is invited. Lloyd v. Vermeulen, 22 N.J. 200, 206 (1956).
The act, which was passed as L. 1968, c. 409, had been introduced as Senate Bill No. 943. This bill superseded earlier Senate Bill No. 897 which had been the subject of a report by the Senate Committee on Law, Public Safety and Defense, Report on Senate No. 897 Electronic Surveillance (October 29, 1968). The replacement of S. 897 was felt by the Committee to be required by the passage on June 19, 1968 of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. Ibid. *77 at 3. In the Statement annexed to S. 943 it was said: "This bill is designed to meet the Federal requirements and to conform to the Federal Act in terminology, type and format which will have obvious advantages in its future application and construction." The Omnibus Act imposed minimum standards upon states with respect to the use of electronic surveillance. 18 U.S.C. §§ 2515; 2516(2); 2518. It was explained by the Senate Judiciary Committee that under the federal law "states would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation." S. Rep. No. 1097, 90th Cong. 2nd Sess. 98 (1968), U.S. Code Cong. & Admin. News, p. 2187. It is to be noted that the federal enactment did not treat specially the area of public facilities or require the demonstration of any added showing comparable to that posited in N.J.S.A. 2A:156A-11. In this context the New Jersey act can be viewed as stricter than its federal parent with respect to the interception of communications over a public facility.
The Statement annexed to S. 943 further recites that "The bill also incorporates, to a major extent, provisions of a draft of a model state statute prepared, subsequent to enactment of the federal law, by Professor G. Robert Blakey * * *." This model state statute, as set forth in Blakey and Hancock, "A Proposed Electronic Surveillance Control Act," 43 Notre Dame Lawyer 657, 674 (1968) provided:
If the facility from which a wire communication is to be or was intercepted are or were public, no order of authorization or approval shall be issued unless the court, in addition to the matter provided in subsection (c) of this section, determines that there is or was a special need to intercept wire communications over such facilities.
A comparative examination of the statutes of other states[1] which have adopted legislation authorizing electronic surveillance *78 pursuant to the federal Omnibus Act indicates that none impose special added requirements for the electronic surveillance of public facilities. It would appear that other jurisdictions have thus far eschewed the more stringent standards proposed in the model state statute and adopted by New Jersey.
Professor Blakey also was responsible in a substantial way for the authorship of the American Bar Association (ABA) Project on Minimum Standards for Criminal Justice, "Standards Relating to Electronic Surveillance" (June 1968). This provided:
No order should be permitted authorizing or approving the overhearing or recording of communications over public facilities unless an additional showing is made establishing probable cause for belief that 
(i) the overhearing or recording will be or was made in such a manner so as to eliminate or minimize insofar as practicable the overhearing or recording of other communications whose overhearing or recording are not or would not be authorized, and
(ii) there is or was a special need for the overhearing or recording of communications over the facilities.[2]. [at 9]
The New Jersey act and the model state statute in format do not follow literally the ABA's proposal that for the electronic surveillance of a public facility there be both a showing of "special need" and a finding that the interception can be undertaken so as "to eliminate or minimize insofar as practicable" the collection of nonsubject communications. The New Jersey act, however, clearly contemplates these twin requirements for the electronic surveillance over a public facility. Thus, N.J.S.A. 2A:156A-12(f) provides that "Every order entered under this section shall require that *79 such interception * * * be conducted in such a manner as to minimize or eliminate the interception of such communications not otherwise subject to interception under this act." (Emphasis added).
In partial explanation of the provision in the model state statute for the special treatment of a public facility it was stated that "Surveillance of a public telephone booth is potentially one of the most sensitive uses of electronic surveillance techniques. Therefore, it ought not to be undertaken without some special showing in addition to that otherwise required." Blakey and Hancock, op. cit., at 674, fn. 37. The commentary upon the similar ABA proposal explicated this view.
This standard reflects the judgment that the wiretapping of public phones should be distinguished from the wiretapping of private phones. Potentially, the number of innocent and unrelated calls which could be intercepted in the tap of a public phone over any length of time raises serious questions about the balance between privacy and justice. On the other hand, if public phones could not be tapped a loophole would be created which would undercut the effectiveness of the standards themselves. It should be possible, therefore, to obtain such an order under certain conditions. The standard thus requires two additional showings to be made before an order to tap a public phone can be obtained. First, it must be demonstrated that the interceptions will be so conducted that the possibility of the interception of innocent calls will be eliminated or minimized. Second, a special need to tap the phone must be shown. For example, where a professional gambler is conducting his business not over his private phone but over a particular public phone, there exists a special need to make interceptions over that phone. It would not be necessary, however, to authorize a continuous tap of the phone. With the use of physical surveillance, the time during which he was using the phone could be pinpointed. The tap could be turned on only during that time. See Katz v. United States, 389 U.S. 347 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967) (bug on phone booth only operative when subject used phone). Indeed, the time limitations of Berger v. New York, 388 U.S. 41, 56-60 [87 S.Ct. 1873, 18 L.Ed.2d 1040] (1967) would seem to require this sort of limitation. When these procedures are followed, the balance between privacy and justice is such that the authorization of the tap of a public phone is not unreasonable. [ABA Project, etc. "Standards Relating to Electronic Surveillance," supra, at 151-152]
*80 Intrusions upon privacy have long been decried as "subversive of all the comforts of society." Entick v. Carrington, 19 How. St. Tr. 1029, 1066 (1765). The New Jersey Legislature evinced a sensitivity to the unique threat to individual privacy posed by electronic invasions. The Senate Committee initiated its report with the observation about "the increasing effectiveness of electronic devices to invade personal privacy." Report on Senate 897, etc., supra, at 1. It recommended a broad definition of what would constitute a private conversation subject to statutory protection (ultimately adopted in N.J.S.A. 2A:156A-2(b)). Ibid. at 6; 2 Hearings Before The Senate Committee On Law, Public Safety And Defense on Senate Bills No. 897, 802 and 803, at 60A-61A (September 17, 1968). The Committee was cognizant of the significant decisions of the United States Supreme Court in Berger v. New York, 388 U.S. 41, 18 L.Ed.2d 1040, 87 S.Ct. 1873 (1967), and the later case of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (which involved an electronic surveillance of a public telephone in an open phone booth). It concluded that "only a tightly controlled system [of electronic surveillance] that gives detailed attention to procedure can pass muster." Report on Senate 897, etc., supra, at 2. Among its "Findings" were that "all forms of electronic surveillance invading individual privacy" be prohibited except as authorized by the proposed bill; and in its view the proposed bill "contains the essential reconciliation between individual privacy and public justice [and it] is simultaneously strictly limited to prevent abuses but broad enough to allow official action under tight court supervision and control." Ibid. at 4-5.
From this history there would seem little reason to doubt that the New Jersey Legislature, by the adoption of section 11 of the New Jersey Wiretapping and Electronic Surveillance Control Act, contemplated specifically the type of public facility and situation which were involved in Katz v. *81 United States, supra.[3] And by implication it thereby intended to incorporate as standards appropriate for an electronic surveillance of such a public facility those which were enunciated by the United States Supreme Court in that case.
Analysis of the Katz case thus becomes imperative. There federal agents had installed a listening device covering a public telephone. Because there was no prior judicial warrant to authorize this surveillance the Supreme Court suppressed the resultant evidence. It nevertheless had this to say:
The question remaining for decision, then, is whether the search and seizure conducted in this case complied with constitutional standards. In that regard, the Government's position is that its agents acted in an entirely defensible manner: They did not begin their electronic surveillance until investigation of the petitioner's activities had established a strong probability that he was using the telephone in question to transmit gambling information to persons in other States, in violation of federal law. Moreover, the surveillance was limited, both in scope and in duration, to the specific purpose of establishing the contents of the petitioner's unlawful telephonic communications. The agents confined their surveillance to the brief periods during which he used the telephone booth, and thy took great care to overhear only the conversations of the petitioner himself.
*82 Accepting this account of the Government's actions as accurate, it is clear that this surveillance was so narrowly circumscribed that a duly authorized magistrate, properly notified of the need for such invertigation, specifically informed of the basis on which it was to proceed, and clearly apprised of the precise intrusion it would entail, could constitutionally have authorized, with appropriate safeguards, the very limited search and seizure that the Government asserts in fact took place. * * * [389 U.S. at 354, 88 S.Ct. at 512-513, 19 L.Ed.2d at 583-584]
The congeries of circumstances in Katz highlight an acute concern of the United States Supreme Court reflected in its earlier decision of Berger v. New York, supra. In that case, pursuant to court order, an electronic surveillance was accomplished through the installation of a listening device in the office of an attorney for a 60-day period. As a result of leads derived from this eavesdrop a similar concealed microphone was later placed in the office of another suspect. In declaring the underlying New York state statute to be unconstitutional the court remarked that "During such a long and continuous (24 hours a day) period the conversations of any and all persons coming into the area covered by the device will be seized indiscriminately and without regard with their connection to the crime under investigation." 388 U.S. at 59, 87 S.Ct. at 1883-1884, 18 L.Ed.2d at 1052.
The necessity for screening out the calls of innocent persons has been elsewhere recognized. In United States v. Escander, 319 F. Supp. 295 (D.C.S.D. Fla. 1970), the court upheld an electronic surveillance involving a public telephone located in the lobby of the apartment building in which the suspect lived. The wiretap order provided that interception be undertaken only when the suspect was in the building and only when it was determined by "voice recognition" that he was actually using the telephone. 319 F. Supp. at 297. State v. Christy, 112 N.J. Super. 48 (Law Div. 1970), is also instructive. It was noted that the telephone facility "though public, was installed within the confines of a private business establishment, apparently controlled by *83 the criminal suspects Rotunda and Cerino and not readily available to the general public." 112 N.J. Super. at 65. Additionally, the target of the investigation Rotunda was characterized as the coordinator or controller of a gambling enterprize.[4] Thus there was a firm basis for believing that most of the calls from the particular telephone would be made by the prime suspect himself and would be fraught with criminal content.
The factors critical in assessing the reasonableness of a particular electronic surveillance of a public telephone can in some measure be gleaned from a synthesis of the foregoing decisions. These would be the identity of the person or persons who are suspected of criminal activity and who are the focus of the investigation; the criminal or incriminating quality of the conversations which are anticipated in view of the criminal roles ascribed to such persons; also the pattern and regularity of the use of the public telephone *84 by the suspects or the degree to which the facility is controlled, monopolized or dominated by them. The filtering or screening of the calls of innocent persons from the electronic surveillance of a public telephone seems quintessential. The electronic surveillance of a public facility should be targeted to the prime suspects and away from innocent and unwitting persons. Consideration should be given to the availability or actual use of the public telephone by members of the public or persons in no way connected with the criminal activities. The risk of netting the conversations of such persons should be reduced, if feasible, through such techniques as contemporaneous physical observations of the actual use of the public facility or perhaps by voice identification or by a sharp constriction of the daily periods of time during which the interception may be undertaken.
The electronic surveillance authorized herein must be rated aganist this constellation of considerations. "The standard of reasonableness embodied in the Fourth Amendment demands that the showing of justification match the degree of intrusion." Berger v. New York, supra, 388 U.S. at 69, 87 S.Ct. at 1888, 18 L.Ed.2d at 1058 (Stewart, J., concurring). Patently the intrusion permitted herein was extensive. The order did not limit the surveillance of the two public telephones to the prime suspect Mitarotonda; it extended the permissible surveillance to persons vaguely described as "unknown white males." The application and affidavit strongly suggested that in some more concrete fashion the persons associated with the prime suspect Mitarotonda could have been identified or described. No prophylactic measures were included in the order to prevent the conversations of innocent persons from becoming ensnared by the electronic surveillance. There was no finding in the application that the suspect and his "unknown white male" cohorts actually monopolized or dominated these telephones to the exclusion of the general public. No restriction was imposed that the interception be conducted only when the prime suspect or any of his "unknown white male" cohorts *85 would actually or probably be using the public telephones. There was no directive that if feasible the telephones be subject to any parallel visual surveillance while being monitored. While a sustained physical surveillance might have jeopardized the investigation, as suggested in the application, it would appear that during the interceptions there could have been at the very least some contemporaneous selective physical observations of the use of the telephones. Facts were disclosed as to particular times when gambling activity over the telephones would likely occur each day. But there was no compression of the surveillance to those hours of prime gambling time.
The provision in the order that the interception terminate "as soon as practicable and be conducted in such a way as to minimize or eliminate" the interception of nonsubject communications, in the absence of any concrete restrictions as to persons, times or duration, constituted at best a loose hobble upon the discretion of the executing officers. The intrusion which was herein authorized by the court was not by this precatory inhibition or in any other meaningful way "limited, both in scope and in duration." Katz v. United States, supra, 389 U.S. at 354, 88 S.Ct. at 512, 19 L.Ed.2d at 583. Rather, it suffered the interceptions of virtually all conversations that might be uttered by any person over two public telephones during any time of the day or night for as long as 30 days. Such an interception is "[t]he traditional wiretap or electronic eavesdropping device [which] constitutes a dragnet, sweeping in all conversations within its scope  without regard to the participants or the nature of the conversations." Berger v. New York, supra, 388 U.S. at 65, 87 S.Ct. at 1886, 18 L.Ed.2d at 1056 (Douglas, J., concurring). In terms of what had in fact been disclosed in the sworn application and supporting affidavit of May 28, 1970 there was not demonstrated a "special need" for the interception of communications from these two public telephones of the breadth, duration and undifferentiated scope authorized by the court here. It follows that the communications *86 were unlawfully intercepted. N.J.S.A. 2A:156A-21(a).
The electronic surveillance authorized by the court on May 28, 1970 eventually disgorged a conversation on June 10, 1970, by an unknown caller identifying himself as "Herb for Frank," from one of the public telephones to a person referred to as "Phil." The telephone number involved in this call was decoded and it was ascertained to be a telephone number listed to Frank A. Sidoti. The contents of the June 10 call furnished the factual basis for the conclusion that "Phil" was a controller who would be dealing with many criminal participants at all levels of the gambling enterprise. Although telephone calls were made later in September to the Sidoti telephone to ascertain whether it was in current use by "Phil," the call of June 10 was relied upon directly to obtain the subsequent wiretap order of September 15, 1970 covering the Sidoti telephone (see footnote 4 supra). This subsequent interception spawned a plethora of incriminating communications which involved directly or indirectly defendants herein and eventually charted the path to the searches and seizures of evidence and the arrests of defendants.
Since the communications were unlawfully intercepted, the suppression of evidence at trial is the end result. The evidence derived from the surveillance of September 15, 1970 is inextricably related to the unlawful surveillance of May 28 and the June 10 telephone call; it cannot be regarded as stemming "from an independent source." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920). As phrased in Wong Sun v. United States, 371 U.S. 471, 487, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1962), the question is whether the evidence sought to be suppressed "has been come at by exploitation of * * * illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Suppression of evidence of guilt is radical surgery. Compare Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. *87 1684, 6 L.Ed.2d 1081 (1961), with State v. Bisaccia, 58 N.J. 586 (1971). Nevertheless, in a case such as this, involving evidence derived from an unlawful electronic surveillance, it is the legal cure mandated by the Legislature. N.J.S.A. 2A:156A-21, viz:
If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall not be received in evidence in the trial, hearing or proceeding.
For the foregoing reasons, the motions are granted.
NOTES
[1] Ariz. Rev. Stat. § 13-1051 (1968); Colo. Rev. Stat. 1963, 40-4-30 (1969); Fla. Stat. Ann., c. 934.01 (1968); Ga. Code Ann. § 26-3004 (1967); Mass. Ann. Law, c. 272 § 99 (1968); Minn. Stat. Ann. § 626A.01 (1969); N.H. Rev. Stat., c. 570-A:1 (1969); N.Y. Crim. Proced., Law § 700.05 (effective Sept. 1971)
[2] This section was amended in the final draft of the ABA's "Standards Relating to Electronic Surveillance" (1971) to make explicit that these requirements for the surveillance of a public facility shall be "in addition to" those applicable to a nonpublic facility. This was not considered to be a substantive charge.
[3] This conclusion is further buttressed by a consideration of a subsequent legislative development. An amendment of section 11 of the New Jersey Wiretapping and Electronic Surveillance Control Act was introduced on March 10, 1969 as Assembly Bill No. 597. This was reintroduced on February 9, 1970 as Assembly Bill No. 611 (which has presently passed the New Jersey Assembly but has not yet passed the Senate). This proposed amendment of section 11 with respect to a public telephone would provide:

If the [facilities] facility from which a wire or oral communication is to be intercepted [are public] is a public coin-operated telephone instrument, no order shall be issued unless the court, in addition to the matters provided in section 10 above, determines that there is a special need to intercept wire or oral communications over such facilities. (Brackets and italics in original)
A. 611, regarded as a proposed clarification of section 11, underscores the view that the requirement for "special need" was intended to include the electronic surveillance of a public coin-operated telephone such as that involved in the Katz case.
[4] In the present case, by way of contrast, Mitarotonda was suspected of being a bettor or bookmaker's runner and using the public telephones to call in gambling bets to a bookmaker. In the second wiretap application of September 14, 1970, based upon the content of a call intercepted on June 10, 1970, a person called "Phil" was thought to be performing the role of "controller" similar to that of Rotunda in Christy, viz:

On the basis of my experience in the field of gambling, the aforementioned telephone conversation [i.e., June 10, 1970] indicates to me that the person known as "Phil" could best be described as a "controller" in this bookmaking and/or lottery operation. Based on my experience, I have found it to be a fact that the function of a controller in such an operation is as follows: He must keep and maintain records of his writers, runners, pickup men, and keep track of all money coming in and all money owed out. He is responsible for the outlay of money for winning numbers (hits), winning numbers which have been missed in the record-keeping (over-looks), and for disputes over whether or not bet-takers are owed bonuses for bringing in extra work. He is also responsible for the return ribbons, which are the tabulations of daily lottery play turned in by individuals known as writers. He also takes care of any other such problems which must be settled at a high level of this operation. He is in control of all records pertaining to the illegal lottery and/or bookmaking business and would have said records on his person, or in his premises.