661 A.2d 1244

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. JOHN WORTHY, LAMONT A. BRISCOE AND WILLIE MAE WORTHY, DEFENDANTS-RESPONDENTS.

Argued February 28, 1995—Decided July 27, 1995.

*Keith M. Warburton,* Assistant Prosecutor, argued the cause for appellant (*Harris Y. Cotton,* Gloucester County Prosecutor, attorney).

*William L. Bowe* argued the cause for respondent Willie Mae Worthy.

*Brian S. O'Malley* argued the cause for respondent John Worthy.

*Michael J. Williams,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney).

*Carrie D. Dingle,* Assistant Deputy Public Defender, submitted a brief on behalf of respondent Lamont Briscoe and relied upon the arguments presented on behalf of respondents Willie Mae Worthy and John Worthy (*Susan L. Reisner,* Public Defender, attorney).

The opinion of the Court was delivered by

HANDLER, J.

This case involves the application of the New Jersey Wiretap and Electronic Surveillance Control Act to tape-recorded telephone conversations between a consenting out-of-state caller and the unsuspecting defendant in New Jersey.

A New Jersey prosecutor's investigator obtained from an informant in another state information that tended to incriminate the defendant, a New Jersey resident. The investigator knew both the informant and the defendant from previous drug investigations. The investigator directed the informant to record his telephone conversations with defendant, and the informant consented to do so. The investigator, however, did not seek or obtain approval from the prosecutor prior to the recording of the calls.

The tape-recorded conversations and evidence subsequently derived from those conversations incriminated defendant in drug offenses in New Jersey, for which he and two co-defendants were indicted. Defendants moved to suppress the initial, recorded conversations, as well as the subsequently obtained evidence, claiming that the failure of the investigator to obtain the approval of the prosecutor for the initial wiretap violated the wiretap

statute. The trial court granted the motion to suppress the initial tape-recorded conversations because the interceptions had not been approved by the prosecutor. The court further suppressed subsequently acquired incriminating evidence, which included later tape-recorded conversations intercepted with the approval of the prosecutor, finding that the subsequent evidence was derived from the initial, unlawfully intercepted communications.

The Appellate Division, in a reported decision, 273 *N.J.Super.* 147, 641 *A.*2d 282 (1994), unanimously affirmed the trial court's rulings. This Court granted the State's motion for leave to appeal.

I

Investigator Michael DiGiorgio is a member of the Narcotics Strike Force of the Gloucester County Prosecutor's Office. On April 1, 1991, Gordon Todd Skinner, a cooperating informant residing in Oklahoma, contacted DiGiorgio. Skinner, who had been indicted in New Jersey on charges of distribution of controlled dangerous substances, provided DiGiorgio with information regarding a telephone conversation he had had with defendant John Worthy, a resident of Paulsboro, New Jersey. DiGiorgio was familiar with both Skinner and Worthy from prior drug-related investigations. Skinner informed DiGiorgio that Worthy had, during the course of the conversation, described his existing cocaine-distribution network in Paulsboro and Philadelphia, Pennsylvania. Worthy indicated to Skinner that he wanted to expand his network to include the sale of marijuana, and allegedly proposed to purchase marijuana from Skinner. That alleged conversation between Worthy and Skinner was not recorded or transcribed.

Prior to that conversation, there was no outstanding investigation targeted at Worthy. Based on the information provided by Skinner, DiGiorgio decided to initiate an investigation of Worthy and to "conduct a 'reverse' purchase of marijuana where Skinner would sell the drugs to defendant in New Jersey." DiGiorgio

directed Skinner to record any future conversations with Worthy. The State concedes that "at that point Mr. Skinner was working ... under the color of law." DiGiorgio did not seek prior approval from the Attorney General or her designee or a county prosecutor to determine "that there exist[ed] a reasonable suspicion that evidence of criminal conduct w[ould] be derived from such interception." *N.J.S.A.* 2A:156A-4c. DiGiorgio stated that he did not seek prior authorization because "[b]asically I didn't believe I needed [it]."

On April 5, 1991, Skinner placed a call from Oklahoma to John Worthy. Skinner recorded the conversation, and later mailed the original tape to DiGiorgio, who marked it as "M.D.—A." During the taped conversation, Skinner asked Worthy "how much could you move in thirty days." Worthy responded that he could sell ten pounds in that period. Skinner then asked if there was "any way you could do twenty [pounds]" in thirty days. Worthy responded that "I would sell ten, I would sell ten broken down and ten weight, ya know what I'm saying." Skinner then asked Worthy if he could sell a pound for "two thousand forty" dollars. Skinner then stated that he would provide a pound of marijuana for $1,700, but that Worthy would have to pay $10,000 up front for twenty pounds of marijuana, with the balance due when the marijuana was sold. Eventually, Skinner calculated that after putting down $10,000 to receive the twenty pounds of marijuana, Worthy would owe him the balance of $24,000. Worthy asked Skinner what his profit would be if he could sell twenty pounds for $2,500 apiece. Skinner replied that that would "give ya sixteen thousand dollars." Skinner instructed Worthy that "I don't want you [Worthy] blowin' this out for some cheap price" and indicated that as long as he [Skinner] received $10,000 up front to pay off suppliers and carriers, the balance could be paid once the marijuana was sold for an appropriate price. Worthy and Skinner then arranged to talk again.

On May 28, 1991, Skinner placed another call from Oklahoma to Worthy. Skinner also recorded this conversation. Worthy indi-

cated that the police were looking for him in Paulsboro, though there were no warrants out on him. Skinner inquired if Worthy had "come up with the ten?" Worthy replied that he had done so. Skinner then asked how much marijuana Worthy wanted to buy. Worthy replied that "I can get rid of thirty." After agreeing on the quantity of marijuana to be purchased, Worthy and Skinner discussed the quality of the marijuana Worthy was purchasing. Worthy agreed to call Skinner to make further arrangements.

On May 31, 1991 Skinner again called Worthy from Oklahoma. This call was recorded on the same tape as the May 28, 1991 call. Worthy asked Skinner when he could come to New Jersey. Skinner responded that he was "probably comin' up on the eighth, ninth or tenth [of June]." Worthy then assured Skinner that "I'm going [to] have your money within thirty days, even if I don't move the whole thirty pounds. I will have your money." The conversation ended with Skinner agreeing to come to New Jersey on June 8. Skinner then sent this second tape to DiGiorgio, who marked it as "M.D.—B."

On June 10, 1991, DiGiorgio applied, for the first time, for authorization for a consensual interception from the Gloucester County Prosecutor. In seeking the authorization, DiGiorgio provided the following factual basis:

> NSF Confidential Informant # 262 [Skinner] has arranged a reverse purchase of thirty (30) pounds of Marijuana with suspect John Worthy and others known and unknown. CI# 262 telephonically contacts John Worthy at various telephone facilities in the Gloucester County area. At this point in the investigation, the aforementioned transaction has been tentatively arranged to occur at the Holiday Inn on Route # 295 in Logan Township. Technicians from the Gloucester County prosecutor's Office will install in the aforementioned hotel room, Video Monitoring equipment in order to record the transaction. CI# 262 has agreed to a telephone, on-body transmitter and room conversations recorded with the suspect John Worthy and others known and unknown, for the purposes of finalizing the reverse purchase of Marijuana. The Affiant respectfully requests authorization for Consensual Interception for Telephone, On–Body and Room Recording with suspect John Worthy and others known and unknown.

The prosecutor approved the request on June 10, 1991. Fearful that Worthy would not purchase the marijuana in Gloucester County due to a prior arrest there, DiGiorgio changed the location

of the "reverse" purchase to a hotel in Cumberland County. On June 12, 1991, DiGiorgio applied for a consensual-interception authorization from the Acting Cumberland County Prosecutor. With the exception of a change in the place of the transaction, the factual basis for the authorization mirrored that used in Gloucester County. The Cumberland County Prosecutor approved the interception application on June 12, 1991 at 9:57 a.m.

A few hours after receiving authorization, DiGiorgio instructed Skinner, now in New Jersey, to make a series of telephone calls to Worthy, who was then at a residence in Pennsylvania. Each call was recorded and retained as evidence by DiGiorgio on audio cassettes marked as "M.D.—C." and "M.D.—D." During the course of these recorded telephone calls, Skinner engaged both John Worthy and Willie Mae Worthy, a co-defendant, in conversation. Skinner convinced John Worthy to meet him in Vineland, New Jersey. Worthy, apparently unable to secure transportation to the rendezvous site, delayed in leaving to meet Skinner. Skinner called and asked when Worthy would be able to arrive in Vineland, and stated, "So I'm [going to] go ahead and go check in there, I['ve] been waiting around for you to get down here so, but I can't wait any longer. You're gonna have to be here by seven." Skinner also informed Worthy: "Okay, ah, let me tell you what, I'm gonna go ahead and stay at this, at a Ramada, in Vineland, it's brand new." Worthy agreed that he would leave a phone number with his mother, Willie Mae Worthy, where he could be reached once he arrived at Vineland. Worthy left for the rendezvous. Meanwhile, Skinner called Willie Mae Worthy a number of times, until Skinner eventually received the phone number at which John Worthy could be reached.

John Worthy arrived at the Ramada Inn, accompanied by co-defendant Lamont Briscoe, at approximately 9:00 p.m. on June 12, 1991. Worthy and Briscoe entered Skinner's hotel room. Skinner was accompanied by an undercover police officer. Thirty pounds of marijuana was exchanged for $10,000. The transaction was recorded on video and audio tape. Worthy and Briscoe were

arrested in possession of the marijuana after leaving the hotel room. Willie Mae Worthy was not present at the place of the sale but was arrested later.

The Gloucester County Grand Jury indicted John Worthy, Lamont Briscoe, and Willie Mae Worthy on charges of second-degree conspiracy to possess a controlled dangerous substance, to possess with intent to distribute, and to distribute marijuana in excess of five pounds, contrary to *N.J.S.A.* 2C:35-5a(1), 2C:35-5b(10), and 2C:5-2. Moreover, John Worthy was charged with conspiring with others in the capacity of organizer, supervisor, financier or manager of a narcotics-trafficking enterprise, contrary to *N.J.S.A.* 2C:35-3. Defendants moved to suppress the three taped telephone conversations originating from Oklahoma, and all evidence seized by police on June 12, 1991, and to dismiss the indictment.

The trial court ordered the suppression of the three recorded conversations initiated from Oklahoma and of the intercepts of June 12, 1991. Those rulings, as noted, were affirmed by the Appellate Division. 273 *N.J.Super.* 147, 641 *A.*2d 282.

## II

■ In general, the New Jersey Wiretap and Electronic Surveillance Control Act (Wiretap Control Act or Act) prohibits the interception of conversations. *N.J.S.A.* 2A:156A-3. In certain exceptional circumstances, however, a conversation may be intercepted. *N.J.S.A.* 2A:156A-4. Thus, "[i]t shall not be unlawful," under the Act, "for"

> [a]ny person acting at the direction of an investigative or law enforcement officer to intercept a wire, electronic or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception; provided, however, that no such interception shall be made unless the Attorney General or his designee or a county prosecutor within his authority determines that there exists a reasonable suspicion that evidence of criminal conduct will be derived from such interception;
>
> [*N.J.S.A.* 2A:156A-4c.]

Defendants contend that the State is not entitled to rely on this exception because Skinner, although consenting to the interception of his phone conversation with defendant, did so at the direction of DiGiorgio, "an investigative or law enforcement officer," who had not obtained the requisite prior authorization from "the Attorney General, [her] designee, or a county prosecutor within his authority."

■  The first major issue is whether the initial pre-authorization interceptions of the telephonic communications violated the terms of the Wiretap Control Act.  That issue, in turn, poses the antecedent question of whether the New Jersey statute applies to the interception of telephone conversations originating from an out-of-state telephone.  *State v. Minter,* 116 *N.J.* 269, 561 *A.*2d 570 (1989), identifies the circumstances under which the Wiretap Control Act may be applied to the interception of such communications.

In *Minter,* federal law enforcement agents arranged for an informant to place telephone calls from Morrisville, Pennsylvania to the defendant's office in Trenton.  The purpose of the calls was to attempt to make a controlled purchase of drugs from the defendant.  The calls were recorded.  Because the federal wiretap act does not require law enforcement officials to obtain supervisory authorization prior to recording a conversation where one of the parties has given consent to the wiretap, *see* 18 *U.S.C.A.* § 2511(2)(c), the agents sought no such authorization.  Despite repeated attempts, the "controlled buy" was never consummated, and the federal agents eventually closed their investigation.  The evidence, including the recorded conversations, was later turned over to New Jersey law enforcement officers.  The defendant was thereafter indicted for conspiracy to distribute cocaine.  Prior to trial, he moved to suppress the wiretap evidence, claiming that the failure of the federal agents to obtain prior authorization required the suppression of the recorded conversations in a state prosecution.  The motion was denied.

Reasoning that state wiretap law cannot bind federal officers, the *Minter* majority perceived the critical question to involve the existence *vel non* of an agency relationship between the federal and state investigators. Accordingly, the Court remanded the matter for a determination of the actual nature of the relationship between the federal and state investigators. 116 *N.J.* at 284–85, 561 *A.*2d 570. Although the dissenters insisted that the evidence be suppressed even if the federal officers acted independently, all members of the Court agreed that intercepted communications "may be excluded from admission into evidence in the courts of this State if State and federal officials were acting in cooperation when the federal officials tapped defendant's telephone." *Id.* at 286, 561 *A.*2d 570 (Pollock, J., concurring and dissenting). The Court ruled that "[i]f a purpose of the investigation is for a State prosecution, the federal agents can, in effect, be deemed agents of the State prosecutors, thus subject to the provisions of *N.J.S.A.* 2A:156A–4(c)." *Id.* at 283, 561 *A.*2d 570. Our unanimous agreement that a cooperative relationship between the federal and state investigators would call for the application of the Act was not qualified by any condition relating to the fact that the informant called from Pennsylvania. Rather, the fact that the targeted defendant was in New Jersey was sufficient to call into operation the New Jersey statute.

The lower courts here expressly followed *Minter*. The trial court thus found:

> In this case, ... [t]he only law enforcement agency involved is the State of New Jersey through the Gloucester County Prosecutor's Office, and it is undisputed that the investigation for which these intercepts were directed and obtained was for use in a potential prosecution in the New Jersey state courts under New Jersey law.

The Appellate Division held

> [i]n this case, there is no involvement by law enforcement agents of other jurisdictions. Skinner was taping the conversations at the request of a New Jersey investigator, concerning a crime being committed in New Jersey and for the purpose of prosecution in New Jersey. The State concedes that DiGiorgio was an "investigative or law enforcement officer" as defined by *N.J.S.A.* 2A:156A–2f. Thus, his conduct is governed by the New Jersey wiretap law.
>
> [273 *N.J.Super.* at 154, 641 *A.*2d 282.]

■ We are satisfied that the application of the Wiretap Control Act in these circumstances does not constitute an impermissible or extra-territorial extension of the statute because the telephone calls, though originating from an out-of-state telephone, involved conversations with a person in New Jersey. As implicitly recognized in *Minter*, there can be no doubt that the legislative concern for privacy embraces the privacy interest that a resident in New Jersey has in telephone conversations that originate from an out-of-state telephone. 116 *N.J.* at 276, 561 *A.*2d 570 ("The legislative history indicates a strong interest in protecting the privacy of individuals and controlling intrusive police activity").

The powerful privacy concerns generated by the spectre of government-directed wiretapping exist even with respect to the consensual interception of such communications, at least when the non-consenting party is in New Jersey. In imposing a requirement of prior prosecutorial approval before the police may direct a "consensual" wiretap, the Legislature sought to safeguard personal privacy. It acknowledged that completely effective law enforcement might be incompatible with a requirement of obtaining a court order before directing the placement of a consensual wire tap. Nevertheless, the Legislature determined not to leave police officers to their unfettered discretion, fearing that too much investigative latitude might lead to abuses of privacy. Accordingly, it directed that the police must get prior approval from the Attorney General or from a County Prosecutor before undertaking a consensual wiretap in order to assure that privacy interests would not be needlessly compromised or abused. *See* Senate Judiciary Committee, *Statement to Senate Bill No. 1417*, at 1 (May 19, 1975).

■ *Minter* is one of a series of New Jersey court decisions that consistently recognize the Legislature's deep and enduring concern for the privacy interests of individuals who are affronted by the interception of telephonic communications. That legislative concern demands the strict interpretation and application of the Wiretap Control Act. *See, e.g., State v. Catania*, 85 *N.J.* 418, 437,

427 A.2d 537 (1981) ("[T]his Court has strictly construed the Wiretap Act so as to afford maximum safeguards for individual privacy"); State v. Cerbo, 78 N.J. 595, 604, 397 A.2d 671 (1979) ("[T]he Wiretap Act constitutes an intrusion into 'individual rights of privacy' and should be strictly interpreted and meticulously enforced") (citation omitted); In re Wire Communication, 76 N.J. 255, 260, 386 A.2d 1295 (1978) ("Wiretap statutes implicating as they do an intrusion into individual rights of privacy, constitutionally and legislatively recognized, should generally be strictly construed").

The trial court here ruled that

the law in New Jersey should be strictly construed to require that any New Jersey law enforcement authority who authorizes an intercept, a consensual intercept, to be obtained, regardless of the point of origin, where it is being obtained as part of an investigation being conducted by that New Jersey law enforcement agency for potential use in a New Jersey state prosecution for a violation of New Jersey law, ... prior authorization must be obtained.

The Appellate Division agreed, holding that if the law-enforcement officer directing the interception of the conversation is acting under the authority of this State, then "N.J.S.A. 2A:156A–4c requires prosecutorial consent even where the wire or oral communication which is intercepted originates outside of New Jersey." 273 N.J.Super. at 153, 641 A.2d 282.

Thus, in accordance with the principles enunciated in Minter, the New Jersey Wiretap Control Act applies to the interception of out-of-state telephone calls when a person located in New Jersey is a party, when the interception is undertaken for the purpose of investigating criminal activity in this State, and when New Jersey law enforcement officers direct, or cooperate in, the interception.

### III

We next consider whether the initial interceptions violated the Wiretap Control Act and must be suppressed.

The Act, N.J.S.A. 2A:156A–21a, provides that an "aggrieved person ... may move to suppress the contents of any intercepted wire, electronic or oral communication, or evidence derived there-

from, on the grounds that[ ] [t]he communication was unlawfully intercepted." If the motion is granted, "the entire contents of all intercepted wire, electronic or oral communications obtained during or after any interception which is determined to be in violation of this act ..., or evidence derived therefrom, *shall not* be received in the trial, hearing or proceeding." *N.J.S.A.* 2A:156A–21 (emphasis added).

We are aware that some courts have determined that not every failure to comply with the Wiretap Control Act mandates suppression of the interception. *See, e.g., State v. Murphy,* 148 *N.J.Super.* 542, 547–48, 372 *A.*2d 1315 (1977) ("Electronic surveillance threatens to intrude upon the privacy and liberty of our citizens to such an extent that we must insist on strict compliance with the substantive and procedural safeguards established by statutory and constitutional law. Nevertheless, suppression of evidence for errors of a procedural nature is not mandatory"). Courts have rather applied the remedy of suppression only to those statutory requirements considered "critical." *See, e.g., State v. Sullivan,* 244 *N.J.Super.* 357, 363, 582 *A.*2d 835 (App.Div.1990) (quoting *State v. Cerbo, supra,* ·78 *N.J.* at 603, 397 *A.*2d 671).

The trial court determined that the requirement of prosecutorial approval was "substantive," in that it protected citizens from overly zealous and completely discretionary law-enforcement practices. Indeed, it is the *sole* protection applicable in cases of consensual interceptions.

Courts have acknowledged that the conditions for authorization of consensual wiretaps are not as strict as those applicable to nonconsensual wiretaps, and have understood that the Legislature did not intend to restrict the activities of law enforcement "to any greater degree than by the one condition it imposed." *State v. Schultz,* 176 *N.J.Super.* 65, 68, 422 *A.*2d 105 (App.Div.1980). *Accord State v. Parisi,* 181 *N.J.Super.* 117, 120, 436 *A.*2d 948 (App.Div.1981); *State v. Bisaccia,* 251 *N.J.Super.* 508, 512, 598 *A.*2d 944 (Law Div.1991). Although the statutory condition for the interception of a consensual wiretap is less onerous than, and

hence not as protective of privacy as, the conditions that surround the nonconsensual interception of conversations, it cannot be doubted that the Legislature viewed the requirement of supervisory approval as an indispensable protection for the privacy interests implicated even in consensual telephone wiretaps.

The history of the statutory provision strongly evidences that intent. The 1968 New Jersey Wiretap Control Act did not prohibit or regulate consensual interceptions. *L.* 1968, *c.* 409, § 4(b). But after observing six years of operation, the Legislature revised the Wiretap Control Act to provide for prosecutorial oversight and prior approval of consensual interceptions. *L.* 1975, *c.* 131, § 4(c); *N.J.S.A.* 2A:156A-4c. The participants in the legislative hearings on consensual wiretaps appeared implicitly to understand and accept the need for supervisory responsibility over even consensual wiretaps. Thus, the debate focused on the nature of, and not on the necessity for, prior supervisory approval. New Jersey Wiretapping and Electronic Surveillance Control Act: Hearings on S. 1417, 1096 Leg., 2d Sess. (1975) (V. I at 40, V. II at 44A–45A).[1] That legislative intention to protect privacy in the

---

[1] Senator Parker and Professor Blakey, reporter to the American Bar Association's project on electronic surveillance, debated the form the control would assume:

Senator Parker: I can understand some of the circumstances where the consensual tap may be essential. If you are going to have one, and you have offered immunity or some other reason for it, why not get a court order? Tell me why a court order wouldn't be just as effective? You then have control under the statute.

Professor Blakey: I have no problem with subjecting consensual to control. Any form of police surveillance should be subjected to control. But we have to carefully ascertain what the nature of the control is. The traditional search warrant practice is based on a showing of probable cause, it is based on the showing of time and limitation, it is based on a direct invasion of privacy—to seize from you some particular piece of property under the context of a wiretap of your conversation without your consent. It is a forcible intrusion on you that has been narrowly circumscribed by our constitutional traditions.

What we have when we have a consensual involvement is no different than a visual observation. Would you want the police to obtain a court

context of consensual wiretaps can be seen in the philosophy of the Wiretap Control Act and the adoption of the 1975 amendments.

The Wiretap Control Act sought to maximize the protection of individual privacy. The sponsor's statement accompanying New Jersey Senate Bill No. 943 stressed that the Act is "designed to protect individual rights and liberties by prescribing rigid controls of use of wire taps or electronic surveillance under court permission and supervision." *Sponsor's Statement to Senate Bill No. 943*, at 13 (Nov. 15, 1968).

Cognizant of that legislative commitment, our Court has consistently and expressly recognized that the New Jersey Wiretap Control Act maximizes the protection of privacy. *State v. Catania*, 85 *N.J.* 418, 437, 427 *A.*2d 537 (1981). *See also State v. Minter, supra*, 116 *N.J.* at 276, 561 *A.*2d 570; *id.* at 291, 561 *A.*2d 570 (Pollock, J., concurring and dissenting). In *Cerbo, supra*, 78 *N.J.* at 602, 397 *A.*2d 671, we noted that the failure of the State to comply with the transfer and sealing provisions of the Wiretap Control Act required the suppression of the contents of the tape and its evidential by-products. The Court denied the defendants' motion for post-conviction relief, however, because the defendants had failed to raise the issue on direct appeal from their judgments of conviction. Significantly, the Court indicated that a properly presented claim of failure to comply with the statutory requirements of the Wiretap Act would warrant suppression of the evidence:

> Where a functional safeguard under the statute is a critical part of the protections surrounding a court-authorized electronic surveillance, a failure to abide by such protective measures should impel the relief envisioned by the Legislature. The breach of the statute should itself call into operation the statutory sanctions prescribed therefor. The motives of the law enforcement officers and the presence or absence of any tactical advantages gained by the police or prejudice accruing to

---

order before they follow someone? Would you want the police to obtain a court order before they really have a conversation?

Senator Parker: If they are using the electronic devices, I think, yes. [New Jersey Wiretapping and Electronic Surveillance Control Act: Hearings on S. 1417, 1096 Leg., 2d Sess. (1975) (V. I at 40).]

defendants should be relatively unimportant in assessing the propriety of statutory relief.

[*Id.* at 603, 397 *A.*2d 671.]

In the present case, the courts below took account of *State v. Sullivan, supra,* 244 *N.J.Super.* 357, 582 *A.*2d 835 (App.Div.1990), in which the court found *N.J.S.A.* 2A:156A–14 violated when law-enforcement officers failed to record a series of communications. The *Sullivan* court ruled, however, that "Section 14 does not provide any similar suppression sanction [*i.e.,* section 21] for violation of the recordation requirement," *id.* at 362, 582 *A.*2d 835, and that the failure to record the intercepted conversations was not a "critical part of the protections surrounding a court-authorized electronic surveillance." *Id.* at 363, 582 *A.*2d 835 (quoting *Cerbo, supra,* 78 *N.J.* at 603, 397 *A.*2d 671). Therefore, it held that the communication was not "unlawfully intercepted," and that the general suppression remedy of Section 21 was not applicable. The *Sullivan* analysis is inapplicable to the circumstances of this case, and therefore we do not in any way express approval of its holding. The strict interpretation accorded the New Jersey Wiretap Act by New Jersey courts, the interests in privacy protected by the New Jersey Wiretap Act, the legislative intent to strengthen the suppression remedy, and the plain meaning of the statutory language demand that the exclusionary remedy here be strictly applied.

■ The State argues further that the privacy concerns of the Legislature are impinged upon only when law-enforcement officials intentionally and deliberately circumvent the New Jersey Wiretap Control Act. We regard purpose and motive, however, only as factors to be considered in determining whether officers of foreign jurisdictions are acting under the "color of [New Jersey] state law." *State v. Mollica,* 114 *N.J.* 329, 355–56, 554 *A.*2d 1315 (1989). The Court in *Minter* did not suggest the need for a showing of bad faith in order to warrant suppression. All that is required to invoke the suppression remedy is a showing of purpose to further a New Jersey criminal investigation.

> Certainly we would not permit State investigators to circumvent the law by merely calling the federal agents and asking them to tap a phone. If a purpose of the investigation is State prosecution, the situation is practically indistinguishable. The Legislature's purpose of protecting the citizen's expectation of privacy would be seriously undermined by admission of evidence not conforming to State guidelines that was gained in the course of such a joint investigation.
> [*Id.* at 283, 561 *A.*2d 570.]

We note, moreover, that the Wiretap Control Act's exclusionary rule is not conditioned on a predicate finding of an intentional or deliberate violation or evasion of the Act's requirements.

The State further contends that no deterrent effect would be served by suppression of the evidence, given the benign nature of the officer's conduct. That argument is misplaced. The statute contains no good-faith exception. *N.J.S.A.* 2A:156A–21. Thus, we have held that "[t]he motives of the law enforcement officers and the presence or absence of any tactical advantages gained by the police or prejudice accruing to defendants should be relatively unimportant in assessing the propriety of statutory relief." *Cerbo, supra,* 78 *N.J.* at 603, 397 *A.*2d 671. Moreover, our jurisprudence has long recognized that "the deterrent purpose of the exclusionary rule [ ] encompass[es] cases of unreasonable official misconduct that was simply misguided or mistaken, as well as intentional or malicious." *State v. Novembrino,* 105 *N.J.* 95, 166, 519 *A.*2d 820 (1987) (Handler, J., concurring). Application of the exclusionary rule encourages respect for protected rights and care in following prescribed procedures among law enforcement officials and departments. *See id.,* 105 *N.J.* at 153, 519 *A.*2d 820; *State v. Macri,* 39 *N.J.* 250, 266, 188 *A.*2d 389 (1963).

The Legislature, by amending the New Jersey Wiretap Control Act, intended to protect privacy interests to a greater extent than does the federal wiretap statute. That was accomplished by interposing prosecutorial review between law-enforcement officers and the citizenry. This review is clearly critical to achieving the desired protection of privacy that the Legislature envisioned, especially in light of its singular nature. In not seeking prosecutorial review, Officer DiGiorgio failed to comply with an essential requirement of the statute; therefore, the conversations were

unlawfully intercepted and must be suppressed according to the statute's own terms.

## IV

The State asserts that even if the recorded calls initiated from Oklahoma are suppressed, the "New Jersey communications, intercepted after the consent of two local prosecutors had been obtained, are not tainted and therefore admissible."

As originally enacted, the Wiretap Control Act provided that "[i]f the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall not be received in evidence in the trial, hearing or proceeding." *L.* 1968, c. 409, § 21. In *State v. Dye*, 60 *N.J.* 518, 291 *A.*2d 825 (1972), the Court refused to suppress two and one-half hours of incriminating conversations gleaned from 105 hours of indiscriminate recording by law-enforcement officials pursuant to a warrant. The Court held that "those illegally taken may be suppressed, or excluded at the trial, but those within the warrant do not become so tainted as to bar their receipt in evidence." *Id.* at 537, 291 *A.*2d 825. This decision had the effect of excluding only non-relevant conversations included in the tapes, but "would not render inadmissible at the trial the recorded work tapes bearing the inculpatory material." *Id.* at 536–37, 291 *A.*2d 825.

Dissatisfaction with the *Dye* decision was evident throughout the 1975 legislative hearings, which considered the conditions to be imposed on consensual wiretaps as well as the clarification and extension of the suppression remedy.[2] *See, e.g., State v. Braeu-*

---

[2] The concern that the suppression remedy as interpreted in *Dye* might not effectively protect privacy was expressly voiced in the hearings:

Senator Lynch: Under a strict interpretation of the statute [New Jersey Wiretap Act], since such interceptions were illegal under Section 21, all that testimony should be dismissed.

Mr. Van Ness: That was the position [that the Office of the Public Defender] argued unsuccessfully [in *State v. Dye*].

Senator Lynch: I think you were right about it.

*nig*, 122 *N.J.Super.* 319, 300 *A.2d* 346 (App.Div.1973); Note, *New Jersey Electronic Surveillance Act*, 26 *Rutgers L.Rev.* 617, 635 (1973). The Legislature, as a result, clarified and strengthened the suppression remedy of section 21 as follows: "If the motion is granted, the *entire* contents of *all* intercepted wire or oral communications obtained during or after any interception which is determined to be in violation of this act ..., or evidence derived therefrom, shall not be received in evidence in the trial, hearing or proceeding." *L.* 1975, *c.* 131, § 21 (underlined words indicate 1975 additions). A plain and strict reading of the amended statute supports the proposition that all evidence derived from the illegal interception—the conversations recorded by that interception, conversations recorded after the unlawful interception, and other evidence "derived" from the illegal interception—shall be excluded.

It is clear, in this case, that the later-seized evidence was derived from the unlawful interceptions. Both the trial court and the Appellate Division found that the subsequent interceptions were impermissibly tainted by the prior unlawful interception. In reaching their result, the lower courts were guided by the standard enunciated in *State v. Johnson*, 118 *N.J.* 639, 573 *A.2d* 909 (1990). The trial court considered the temporal proximity between the illegal activity and the evidence in question, the presence and nature of intervening events, and the flagrancy of the

---

[New Jersey Wiretapping and Electronic Surveillance Control Act: Hearings on S. 1417, 1096 Leg., 2d Sess. (1975) (V. I at 12).]

Attorney Harvey Weissbard suggested that the Committee consider overruling *State v. Dye, supra,* by strengthening Section 21.

Most importantly, however, I think something should be done, re-enacting this law, to overrule the Dye decision. One alternative would be to amend section 21, the suppression section, to state clearly and unequivocally that "where suppression is ordered as a result of the violation of any of the substantive provisions of the Act, *all the calls intercepted as a result* of the wiretap must be suppressed, innocent and incriminating."

[New Jersey Wiretapping and Electronic Surveillance Control Act: Hearings on S. 1417, 1096 Leg., 2d Sess. (1975) (V. II at 13A) (emphasis added).]

police misconduct. It determined that the temporal factor itself was "not particularly significant ... under the fact pattern of this case." The Appellate Division concurred in the trial court's characterization of the elapsed time between the last interception of the Oklahoma communications and the application for prosecutorial consent as "relatively insignificant." *Id.* at 155–56, 641 *A*.2d 282. With respect to the flagrancy of the police misconduct, the trial court conceded that the misconduct was "benign." The Appellate Division acknowledged the trial court's determination that Investigator DiGiorgio's actions were a "good faith mistake" and not flagrant and deliberate misconduct. *Id.* at 155, 641 *A*.2d 282.

The State proffered as intervening events the authorization obtained on June 10 from the Gloucester County Prosecutor's Office and on June 12 from the Cumberland County Prosecutor's Office. The trial court, however, found this "to be a bootstrapping argument."

> The authorizations are based, ... exclusively on the information which was obtained by the State in the illegally taped conversations. There is no independent evidence or information placed before the prosecutors upon which they acted and which could, therefore, provide the basis for an intervening and independent intervening event under this prong of the analysis.

Examining the totality of the circumstances, the court determined that "the disputed evidence in this case ... is inextricably tied to the illegal intercepts that have been previously suppressed." The Appellate Division adopted the trial court's determination that "the prosecutors' consents cannot be considered intervening circumstances since they were based entirely on the information obtained through the unlawful interception of the Oklahoma communications." *Ibid.*

We concur in the determinations reached by the lower courts that the evidence is impermissibly tainted. Both applications for authorization relied entirely on the illegally intercepted communications. Investigator DiGiorgio used as the basis for his reasonable suspicion the following clause, present in both applications: "NSF Confidential Informant # 262 [Skinner] has arranged a

reverse purchase of thirty (30) pounds of Marijuana with suspect John Worthy and others known and unknown. CI# 262 telephonically contacts John Worthy at various telephone facilities in the Gloucester County area."

We see no cause to disturb the trial court's finding that "[t]here is no independent evidence or information placed before the prosecutors upon which they acted and which could, therefore, provide the basis for an intervening and independent intervening event" sufficient to contain the taint of the unlawful evidence that was in fact used and relied on. *See State v. Sidoti,* 116 *N.J.Super.* 70, 86, 280 *A.*2d 864 (Law Div.1971) (ruling that evidence that "is inextricably related to the unlawful [wiretap] surveillance ... [ ]" cannot be regarded as stemming "from an independent source").

■ The State next argues that, even if tainted, the evidence would have inevitably been discovered wholly independently of the recording of Skinner's and Worthy's conversations. More precisely, the State argues that Worthy would have been apprehended for the drug offenses he actually committed through investigative efforts that would have occurred inevitably and independently of the investigation involving the unlawful wiretap interception. Defendant answers that the plain language of *N.J.S.A.* 2A:156A–21 does not allow for an exception based on "inevitable discovery."

In light of the Legislature's obvious concern for privacy and its express and consistent recognition of the need for an effective exclusionary rule to assure the protection of privacy, it is not reasonable to impute a legislative intent to undermine that exclusionary rule with such an exception. *See State v. Molinaro,* 117 *N.J.Super.* 276, 295, 284 *A.*2d 385 (Law Div.1971) (observing that "judiciary in a different setting could abandon or modify the exclusionary doctrine since this rule originated with the courts," but that abandonment is not proper where Legislature itself "has instituted such a rule").

In *State v. Sugar,* 100 *N.J.* 214, 495 *A.*2d 90 (1985), this Court adopted an "inevitable discovery" exception to the judicially-creat-

ed exclusionary rule applicable to an unreasonable search and seizure. The exception applied when:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [*Id.* at 238, 495 *A*.2d 90.]

The Court ruled in *Sugar* that the "State must show by clear and convincing evidence that had the illegality not occurred, it would have pursued established investigatory procedures that would have inevitably resulted in the discovery of the controverted evidence, wholly apart from its unlawful acquisition." *Id.* at 240, 495 *A*.2d 90.

Even if the *Sugar* inevitable discovery exception applied, the State could not, in this case, take advantage of it. The State's claim of inevitable discovery is based on the notion that the New Jersey Wiretap Control Act prohibits the recording of conversations in certain circumstances, but does not prohibit an individual's disclosure of the contents of such conversations to law-enforcement officials. Thus, the State asserts, had Skinner not recorded the pre-authorization, conversations, DiGiorgio would have obtained the necessary authorizations based on Skinner's oral recounting of the April 1, 1991 conversation and the knowledge possessed by DiGiorgio of defendant's existing drug activity. Arguing that the investigator listened to the tapes simply "to corroborate that the reports given to him by Skinner over the telephone of the contents of those conversations [were], in fact, accurate," the State characterizes the taping as "ministerial."

However, the central question to be addressed in invoking the "inevitable discovery" rule "is whether that very item of evidence would inevitably have been discovered, not merely whether evidence roughly comparable would have been so discovered." Wayne LaFave, *Search and Seizure*, § 11.4(a), at 380 (1987). Here, the trial court did not find that the tapes were

merely corroboration, as the State asserts. The trial court found that DiGiorgio had to listen to the tapes under the circumstances, because

[h]e was dealing with an informant, who had a criminal background, who was under very serious criminal charges himself and who was acting in a manner to gain a benefit for himself in his own—with respect to his own pending charges.

The court found that the credibility and character of Skinner was so questionable that the tapes were "essential and critical in this investigation and in carrying it forward."

The Court in *Sugar* observed that when the State seeks to rely on the inevitable discovery exception despite being itself "directly responsible for the loss of the opportunity lawfully to obtain evidence," 100 *N.J.* at 239, 495 *A.*2d 90, "it is impossible to be certain as to what would have happened if no illegal conduct had occurred." "Consequently," the Court ruled, "the State should be required to make a strong showing that, by the admission of the evidence, it is in no better position than it would have enjoyed had no illegality occurred." *Id.* at 239–40, 495 *A.*2d 90.

"[C]ourts must be extremely careful not to apply the 'inevitable discovery' rule upon the basis of nothing more than a hunch or speculation as to what otherwise might have occurred." Wayne LaFave, *supra*, § 11.4(a), at 383. Prior to the April 1, 1991 conversation, there was no existing investigation of Worthy. There is no indication that any other independent investigative process would have resulted in the interception of the conversations and the arrest of the defendants in the hotel in Vineland on June 12. It was during the course of the illegally recorded conversations that Worthy and the informant agreed on the essential elements of the transaction: quantity, price, method of payment, and the tentative dates the deal would be completed. As the trial court noted, the State "may have gotten John Worthy on something someday, somewhere, if they continued investigating him, but I am not convinced that they would have ever gotten to this deal with these 30 pounds of marijuana in this hotel room on June 12th, 1991 and I am not clearly convinced of that." *Quoted at* 273 *N.J.Super.* at 156, 641 *A.*2d 282.

Rejecting the State's contention that the "New Jersey tapes come within the narrow, 'inevitable discovery' exception to the exclusionary rule," the Appellate Division held that the "State has failed to show by clear and convincing evidence the likelihood of a separate investigation that would have led to the detection of defendant's participation in the crimes charged in the indictment." 273 *N.J.Super.* at 156, 641 *A.*2d 282. We concur.

V

For the reasons expressed in the opinion, the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices POLLOCK, O'HERN, GARIBALDI, STEIN, HANDLER, and COLEMAN—7.

*Opposed*—None.